Timothy MASTERS, Petitioner,

v.

The PEOPLE of the State of
Colorado, Respondent.

No. 01SC291.

Supreme Court of Colorado,
En Banc.

Oct. 15, 2002.

Rehearing Denied Dec. 16, 2002. *

* Chief Justice MILLARKEY, Justice MARTINEZ and Justice BENDER would grant the Petition.

Carrigan, Chambers, Dansky & Zonies, P.C., Nathan D. Chambers, Denver, Colorado, Attorneys for Petitioner.

Ken Salazar, Attorney General, Elizabeth Rohrbough, Assistant Attorney General, Denver, Colorado, Attorneys for Respondent.

Justice RICE delivered the Opinion of the Court.

A jury convicted Defendant, Timothy Masters, of first degree murder. The court of appeals affirmed the conviction. Defendant petitioned this court for certiorari review of three evidentiary issues and that review was granted. We now affirm.

## I. FACTS AND PROCEDURAL HISTORY

Peggy Hettrick's body was found lying in an open field in Fort Collins, Colorado on the morning of February 11, 1987. A bicyclist, passing by the field on his way to work, discovered the body and immediately informed the police. The body had been partially disrobed and positioned on its back with the legs slightly apart and arms over its head. The right breast and pubic area were exposed. The left nipple and a portion of the victim's vagina had been excised with a very sharp instrument, possibly a scalpel. There were also distinctive scratch marks on the victim's face.

The Larimer County Coroner determined that the victim had been stabbed in the back by a serrated knife with a five inch blade. The blow lacerated her left lung and left pulmonary artery, resulting in massive blood loss. She died within minutes of the attack.

On the curb of the street adjacent to the field where the victim's body was found, the police discovered a large pool of blood with a half-smoked cigarette belonging to Peggy Hettrick lying in the middle. This, along with other evidence, led them to believe that the knife wound in the victim's back was caused by "a surprise attack from behind at the location of the blood pool on the street curb." After delivering the fatal wound, a bloody trail indicated that the perpetrator dragged the victim's body 103.5 feet into the field where it was found.

The body was left within several hundred feet of Defendant's home, and could be seen from Defendant's bedroom window. Accordingly, at approximately 10:00 a.m. that morning, Defendant was contacted at his high school concerning the murder. When asked whether he knew why the detectives were there, Defendant nodded and said that "it had been bothering him." Elaborating, Defendant told the detectives that he had seen a body as he was walking to catch the school bus that morning. He did not report it, he explained, because he thought it was a mannequin. Later, Defendant said he did not report the body because he thought it was a trick and did not want to be made fun of. In addition to his own admission, a footprint found in the bloody drag trail close to the body indicated that Defendant had been there that morning.

Subsequently, the police conducted consensual searches of Defendant's bedroom, locker, and backpack. In Defendant's bedroom, police found a large collection of knives and swords. The collection included six survival knives with long blades—one of which had a hollow handle containing a scalpel. The police also found a suitcase containing pornographic photographs of female genitalia and a large number of writings and drawings Defendant had produced. In Defendant's backpack and locker, police discovered more writings and drawings produced by Defendant, including two maps of the crime scene. A third set of drawings and writings was seized by police in 1998 when Defendant was arrested. In all, police seized approximately 2200 pages of written material produced by

Defendant; over 1000 of these were admitted into evidence.

Defendant's writings and drawings are graphic and often repulsive. They indicate that Defendant was deeply fascinated with death, particularly with death by stabbing or slicing. There are numerous drawings of survival knives, and knives, of one sort or another, are frequently the instrument of murder in Defendant's productions. Many of the victims in Defendant's productions are killed from behind in a surprise attack or have distinctive scratch marks on their faces. Pools or trails of blood often accompany images of murder, torture, decapitation, or dismemberment.

Hatred of women is a common theme throughout many of the Defendant's productions, and much of the violence is associated with sexual overtones. For example, in one narrative that approaches 150 pages in length Defendant relates a world in which a group of boys, the Recons, are at war with a group of girls, the Reds. At one point, a character named Madic, with whom Defendant identifies himself, states that "[i]t gave me a hard-on to see at least ten Reds drop instantly." In another, more graphic example, there is a drawing of a knife slicing through what appears to be a vagina.

Although there are multiple pictures and narratives evincing similarities to Peggy Hettrick's murder, there is not a single image or passage that duplicates the crime. There is not a picture of, or story about, a woman being stabbed in the back or having her nipple excised.

In addition to Defendant's written material and unusual behavior on the morning after the murder, substantial other evidence pointed to the Defendant as the perpetrator of this murder. First, there were several similarities between Defendant's mother and Peggy Hettrick. Ms. Hettrick was killed almost exactly four years after the death of Defendant's mother. The memory of his mother's death was apparently still fresh in the Defendant's mind. Two Mother's Day cards, made by Defendant when his mother was still alive, were found in his backpack on the day after the attack. A photocopy of her death certificate was found in the kitchen in his residence. Ms. Hettrick, like Defendant's mother, had long, wavy red hair. Defendant admitted that, although he did not know Ms. Hettrick's name, he might have seen her around the neighborhood.

Second, one particular drawing found in Defendant's backpack the day after the victim's body was found aroused suspicion. The drawing depicts a person dragging a body of another by the armpits. Blood drips from the back of the body as it is dragged, leaving a bloody trail. This is exactly how investigators suppose the victim was moved from the street to the field. When asked why he drew the drawing, Defendant told investigators that he drew it to "get something out of his system" because it was bothering him. However, the prosecutor pointed out that Defendant could not have known, based solely on his observations on the morning after the murder, that the victim had been dragged in that manner.

Third, a detective asked Defendant whether he had ever thought about committing this type of murder. Defendant responded that he had.

Fourth, the nature of the wound inflicted on the victim suggested that the perpetrator was left-handed. Defendant was left-handed.

Fifth, Defendant possessed the specialized weapons necessary to commit the crime. The wounds inflicted upon Ms. Hettrick required two weapons: a serrated knife with a blade at least five inches in length and a precise cutting instrument such as a scalpel. The former was used to inflict the deadly injury; the latter to carry out the subsequent mutilation. Police recovered six survival knives in Defendant's bedroom, all of which had hollow handles. Inside one of these handles, police discovered a scalpel.

Sixth, Defendant showed that he was familiar with the characteristics of the weapon used. While interrogating the Defendant, a detective told Defendant that stabbing someone with a serrated blade would cause a lot of damage. Defendant, after receiving and waiving *Miranda* warnings, replied, "Yeah, but it would be tough to pull it back out."

Finally, Defendant showed that he was familiar with specific details of the crime. First, he told detectives that he thought the victim was wearing pink shoes. In fact, she was not; her socks were pink. However, because her pants had been pulled down, her socks would not have been visible to someone merely walking by the crime scene. In another interview with law enforcement, Defendant was asked if he had any suggestions concerning the investigation. Defendant suggested that the detective canvas a ditch near a particular bridge. Six months later, a survival knife with a serrated blade and hollow handle was found in this ditch very close to the bridge. At trial, the coroner opined that the serration on that knife could account for the irregularity in the stab wound in the victim's back.

Notwithstanding this circumstantial evidence, no direct evidence was found to link Defendant to the crime. As a result, he was not immediately charged.

Ten years later, the Fort Collins police department retained Dr. Reid Meloy, a forensic psychologist and expert in sexual homicide, as a consultant in this case. After reviewing the evidence in the case, including all of Defendant's drawings and writings seized from his bedroom, backpack, and locker, Dr. Meloy prepared a report implicating Defendant in the death of Peggy Hettrick. In 1998, based on Dr. Meloy's conclusions, as well as the other evidence in the case, the police arrested Defendant at his Ridgecrest, California home. Police also seized additional drawings and narratives Defendant had created after the crime, as well as other items, from which Dr. Meloy prepared a second report.

Defendant was tried for first degree murder in 1999. Prior to trial, Defense counsel filed a motion in limine arguing that Dr. Meloy's testimony interpreting Defendant's drawings and writings as well as the drawings and writings themselves, must be excluded pursuant to CRE 404 because: (1) Dr. Meloy's testimony and Defendant's drawings and writings were evidence of Defendant's bad character; and (2) the prosecution was offering this character evidence for the purpose of proving that Defendant acted in con-formity therewith when he allegedly murdered Peggy Hettrick.

The prosecution responded that this evidence was admissible under CRE 404(b) because it was not being offered to prove the character of a person in order to show that he acted in conformity therewith. Instead, the prosecution argued that it was being offered "to show the connections or links between this defendant and the crime scene of the murder of Peggy Hettrick." "Here, the evidence sought to be introduced is relevant to prove the identity of the perpetrator, the motivation and premeditation of the defendant, the defendant's planning of the crime, his opportunity to commit the crime, and his subsequent knowledge of the crime."

The prosecution's theory of relevance depended primarily on Dr. Meloy's interpretation of Defendant's drawings and writings. Dr. Meloy opined that the fantasies embodied in Defendant's written productions actually served both as motive and rehearsal for Peggy Hettrick's murder. As such, the drawings, and Dr. Meloy's interpretation thereof, "explain an otherwise inexplicable act of random violence." Pursuant to this theory of relevance, the prosecution argued that "all references to hatred against women, surprise attacks, use of survival knives, scratch marks, blood pools, drag trails, any and all references to cuttings on the bodies of victims and all drawings pairing violence with sex" should be admissible.

The pretrial hearing on this issue was extensive, and the majority of it consists of Dr. Meloy's testimony. At the hearing, the prosecution qualified Dr. Meloy as a board-certified forensic psychologist with expertise in the behavior and motivation of individuals committing sexual homicide. He testified extensively regarding research in the area of sexual homicide, which the trial judge found was generally accepted within the field of forensic psychology.

Dr. Meloy defined sexual homicide as the "intentional killing of a human being during which there is sexual activity or evidence of sexual activity." Sexual homicides fall into one of three categories: organized, disorganized, and mixed. Sexual homicides, Dr. Me-

loy explained, are rare, accounting for only one-half to one percent of all homicides occurring in the United States each year.

The features that distinguish a sexual homicide are: (1) primary sexual activity usually involving semen or ejaculation; (2) secondary sexual activities with attention paid to the victim as a sex object, including (a) undressing of a female victim and exposure of the breasts or genitals, (b) acts of violence involving mutilation of the body in the areas of the breast or vagina, (c) insertion of objects into the mouth, anus, or vagina, or (d) posing the body or displaying it in an area where it will be discovered easily. In addition, sexual homicides sometimes involve a signature—a personal, usually symbolic psychosexual act specific to the perpetrator. Moreover, unlike many other types of homicides, where a motive may be fairly obvious, the motive in a sexual homicide is typically "intrinsic, internal, [and] very psychological for the individual."

Dr. Meloy opined that Peggy Hettrick's murder was "generally a disorganized sexual homicide with some organized features." She had been posed with her hands behind her head, her jeans pulled down exposing her pubic hair and genitals, and one breast exposed. The body was displayed in a field where it would be easily found. Her left nipple and a portion of her vagina had been excised, and there were distinctive scratch marks on her right cheek. Dr. Meloy opined that the signature in this crime was the mutilation of Ms. Hettrick's sex organs, and possibly the scratch marks on her face. He further testified that the stab wound as well as the mutilation was done to satisfy the sexual desire of the perpetrator.

Dr. Meloy also explained the role of fantasy in sexual homicide. Fantasy, Dr. Meloy opined, serves a number of functions. First, it can serve as the primary motivation for a sexual homicide. Perpetrators are sexually aroused by violence, but as a perpetrator becomes habituated to a violent fantasy, the pleasure he experiences from that fantasy diminishes. This reduction in pleasure, and the concomitant desire to reestablish the initial level of stimulus, may serve as the motive for acting the fantasy out in the real world.

Second, fantasy can become a rehearsal in the mind of the perpetrator for carrying out the sexual homicide. Dr. Meloy testified that the primary reason perpetrators of sexual fantasy engage in rehearsed fantasy is to express deeply felt hostility to women in a very private way.

Dr. Meloy testified further that researchers have identified five structural elements of rehearsal fantasy: (1) situational; (2) paraphilic; (3) demographic; (4) relational; and (5) self-perceptual. Situational refers to the situation in which the perpetrator wants to encounter the victim. Paraphilic describes the type of abnormal sexual behavior the perpetrator desires. Demographic describes the physical characteristics of the preferred victim. Relational refers to the actual relationship with the victim. Finally, self-perceptual describes how the perpetrator wants to see himself and how he wants to feel during both the rehearsal fantasy and the sexual homicide.

Dr. Meloy opined that Defendant's written productions reflect his fantasies. Accordingly, he identified drawings or narratives pairing sex and violence and reflecting hatred of women. He also organized Defendant's drawings and writings into the five categories of rehearsal fantasy in order to demonstrate their relevance to the crime. First, he opined that the situational element of Defendant's drawings and writings reflected a preference for surprise, or blitz attacks. Peggy Hettrick was killed in a surprise attack. Second, Dr. Meloy identified picquerism as the paraphilic aspect of Defendant's written productions. Picquerism, Meloy testified, is a paraphilic behavior in which a cutting instrument is used on a victim for sexual pleasure. The penetration of the cutting instrument actually serves as a substitute sexual penetration. Peggy Hettrick was stabbed with a knife and then sexually mutilated with a second, very sharp, cutting instrument. Third, Dr. Meloy opined that the demographic aspect of this case centers on Defendant's mother. Both Peggy Hettrick and Defendant's mother had red hair, and they were around the same age when they died. In addition, exactly four years before Peggy Hettrick was murdered, De-

fendant's mother was rushed to the hospital with a deadly virus that killed her the next day. Thus, Dr. Meloy opined that the homicide was a displaced matricide, stemming from Defendant's feelings of abandonment by his mother. Although there only appear to be a couple of Defendant's written productions that directly reference anger toward his mother, Dr. Meloy concluded that representations of vulnerable females within Defendant's written productions fell within the demographic component of Defendant's fantasies. Fourth, Dr. Meloy testified that the relational component of Defendant's fantasies indicated that his preferred victim would be either a stranger or, at best, a casual acquaintance. Defendant told police that he did not know Peggy Hettrick, but may have seen her around the neighborhood. Finally, Dr. Meloy testified about the self-perceptual component of Defendant's fantasies. He testified that Defendant's identification with two fictional characters from his narratives reveals the way he perceives himself. Defendant's narratives represent both of these characters as detached and unfeeling. The only emotions associated with the homicidal acts they commit are anger, or pleasure. The remainder of Dr. Meloy's testimony at the hearing consisted of identifying examples from Defendant's drawings and writings that fell within these five categories.

Finally, Dr. Meloy explained the concept of "trigger mechanisms" or "precipitating events." A trigger mechanism or precipitating event is a particular occurrence in the life of a perpetrator which causes him to act out his fantasies in the real world. Dr. Meloy testified that such an event could be conflict with one's spouse or girlfriend, grief over the death of a loved one, or conflict with women of authority in a school or employment setting.

The trial judge's rulings permitted Dr. Meloy to discuss the concept of sexual homicide and identify the characteristics of the murder that were consistent therewith. Reasoning that it "put into context the physical evidence surrounding the death of Ms. Hettrick and is valuable information that the jury is entitled to consider," the trial court also permitted Dr. Meloy to explain the relevance of fantasy to sexual homicides and identify examples of Defendant's written productions that fell within the five categories of rehearsal fantasy. Similarly, the trial court permitted Dr. Meloy to testify hypothetically as to the types of events that might be a trigger for a sexual homicide, but not that any particular event was indeed a triggering event. Separately, however, the prosecution was allowed to present testimony from Defendant's high school teacher and counselor about an incident that it theorized was a trigger mechanism for the murder, but this actual inference was left for the jury to draw.

Dr. Meloy was not allowed to give opinions on ultimate issues of fact; he could not opine that Defendant committed the crime, that there was a particular likelihood that Defendant committed the crime, or that Defendant's written productions were evidence that he committed the crime. Dr. Meloy was also prohibited from testifying that Ms. Hettrick's murder was a displaced matricide. Finally, the trial judge explicitly precluded Dr. Meloy from giving any opinions indicating that Defendant fit the characteristics—or profile—of a perpetrator of sexual homicide. Of the fifteen paragraphs labeled "Findings and Opinions" in Dr. Meloy's first report, six were excluded in their entirety, and Dr. Meloy was only allowed to testify to parts of another seven.

The trial court also excluded all of the opinions contained in Dr. Meloy's second report—which were based on material produced by Defendant after the murder occurred—as "essentially profile evidence being offered as substantive evidence of defendant's guilt." However, the trial court did state that the productions themselves could be used in reference to the categories of rehearsal fantasy or could be used simply as evidence that Defendant continued to produce material of this nature.

The trial court's rulings do not specifically address the admissibility of the writings and drawings Defendant produced before the murder—those seized from his bedroom, locker, and backpack. However, it is clear that the trial judge implicitly found them, like the post-murder productions, admissible

under CRE 404(b). At trial, the prosecution introduced Defendant's drawings and writings as evidence, Dr. Meloy testified pursuant to the trial court's pretrial rulings, and ultimately, the jury convicted Defendant of first degree murder. The court of appeals affirmed.

## II. ANALYSIS AND APPLICATION

We granted certiorari on three issues:

(1) Whether it was proper for an expert to testify as to the traits and characteristics of perpetrators of sexual homicides and to further testify that the defendant's writings and drawings were consistent with the characteristics of a typical perpetrator;

(2) Whether the admission of the defendant's drawings and writings violated CRE 404(b); and

(3) Whether the admission of evidence of a confrontation between the defendant and a schoolteacher violated CRE 404(b).

### A. Whether the trial court abused its discretion in concluding that Dr. Meloy's testimony was admissible.

CRE 702 governs the admissibility of expert testimony. *People v. Shreck*, 22 P.3d 68, 70 (Colo.2001). It provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

CRE 702.

■ Trial courts are vested with broad discretion to determine the admissibility of expert testimony under CRE 702, and the exercise of that discretion will not be overturned unless manifestly erroneous. *Lanari v. People*, 827 P.2d 495, 502 (Colo.1992); *People v. Fasy*, 829 P.2d 1314, 1317–18 (Colo. 1992). "This deference reflects the superior opportunity of the trial judge to gauge both the competence of the expert and the extent to which his opinion would be helpful to the jury." *People v. Williams*, 790 P.2d 796, 798

(Colo.1990) (quoting *In re Air Crash Disaster at New Orleans, La.*, 795 F.2d 1230, 1233 (5th Cir.1986)).

■ We have, however, provided trial courts some guidance in the exercise of this discretion. In *Shreck*, we held that expert testimony is admissible under CRE 702 if: (1) the scientific principles underlying the testimony are reasonably reliable; (2) the expert is qualified to opine on such matters; and (3) the expert testimony is useful to the jury. *Shreck*, 22 P.3d at 77. "In light of this liberal standard, a trial court should also apply its discretionary authority under CRE 403 to ensure that the probative value of the evidence is not substantially outweighed by unfair prejudice." *Id.* at 79.

Defendant does not dispute Dr. Meloy's qualifications. We therefore limit our review to whether the scientific principles underlying Dr. Meloy's testimony were reasonably reliable, whether his testimony was useful to the jury, and whether the probative value of his testimony is substantially outweighed by the danger of unfair prejudice.

### 1. The trial court did not abuse its discretion in concluding that Dr. Meloy's testimony was reasonably reliable.

■ In evaluating the reliability of the scientific principles underlying an expert's opinion, we have instructed trial courts to consider the totality of the circumstances of each specific case. *Shreck*, 22 P.3d at 77. Because each case is unique, an appellate court cannot predict the type of "scientific, technical, or other specialized knowledge" that may be useful to a jury in a particular case. Indeed, the possibilities are virtually limitless. As we recognized in *Shreck*, this variation precludes us from articulating any one test for judging the reliability of all expert testimony. *Id.; see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) ("The conclusion, in our view, is that we can neither rule out, nor rule in, for all cases and for all time the applicability of the factors mentioned in *Daubert*, nor can we now do so for subsets of cases categorized by category of

expert or by kind of evidence. Too much depends upon the particular circumstances of the particular case at issue."). Simply put, there is no single test that can be logically applied to the multitude of subject areas potentially appropriate for expert testimony, and any attempt to formulate one would undoubtedly and arbitrarily exclude expert testimony that is both reliable and helpful to juries. This is why the determination of the reasonable reliability of expert testimony is left within the sound discretion of the trial court.

Instead of mandating that a trial court consider a particular set of factors in assessing the reliability of expert testimony, we have held that "the CRE 702 inquiry contemplates a wide range of considerations that may be pertinent to the evidence at issue." *Shreck*, 22 P.3d at 77; *see also Brooks v. People*, 975 P.2d 1105, 1114 (Colo.1999) (holding that instead of articulating a specific multi-factored test, it is preferable to focus on "whether the evidence is reasonably reliable information that will assist the trier of fact").

■■■ Because social science attempts to understand highly complex behavior patterns, it is necessarily inexact. *Stevens v. People*, 796 P.2d 946, 956 (Colo.1990). However this does not make it per se inadmissible. *Cf. id.* ("The inability of the social sciences to establish an exclusive cause-effect relationship between sexual abuse and certain behavioral changes in children does not require the prohibition of evidence concerning behavioral changes."); Christopher B. Mueller and Laird C. Kirkpatrick, *Evidence* § 7.22, at 766 (2d ed. 1999) ("Syndrome and framework evidence bring to trials the insight of social science and psychology. These insights help factfinders appraise the attitudes and behavior of actors, draw inferences from other evidence about what they probably did and thought and intended, and make credibility decisions when they and others testify."). Like other expert testimony, its admissibility depends on whether it is reasonably reliable, and whether it is helpful to the jury—and thus on the facts of the case.

In this case, Dr. Meloy was qualified as a forensic psychologist with special expertise in the motivation and behavior of individuals committing sexual homicides, a recognized subspecialty. Prior to this case, Dr. Meloy had been qualified as an expert in sexual homicide five times, twice for the prosecution. In addition, the prosecution established that the sexual homicide evidence elicited from Dr. Meloy is generally accepted within the forensic community. Meloy testified that there is a fairly extensive body of specialized literature dealing with sexual homicide; researchers have been studying sexual homicide for over 100 years. Over that time, the research has developed from mere anecdotal accounts of sexual murders to the systematic comparison of groups of sexual homicide perpetrators to control groups, notwithstanding the relative rarity of sexual murders. Dr. Meloy admitted that research in the area of sexual homicide had not attained a predictive capacity. However, he also testified the ability to predict is not the only indicator of validity.

On the record before us, we cannot conclude that the trial court committed manifest error when it determined that Dr. Meloy's testimony was reasonably reliable. Accordingly, we turn our attention to whether his testimony was helpful to the trier of fact.

## 2. Dr. Meloy's testimony was helpful to the jury.

■■■ Under the second prong of the CRE 702 inquiry, the proffered testimony is admissible if it "will assist the fact finder to either understand other evidence or to determine a fact in issue." *Lanari,* 827 P.2d at 502; *see also* Fed.R.Evid. 702 advisory committee notes. The "crucial question" is " ' "On *this subject* can a jury from *this person* receive appreciable help." ' " *Williams,* 790 P.2d at 798 (quoting Jack B. Weinstein & Margaret A. Berger, 3 *Weinstein's Evidence* ¶ 702[01], at 702–7 to 702–8 (1988) (quoting 7 *Wigmore on Evidence* § 1923, at 21 (3d. ed.1940))) (emphasis in original).

There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to deter-

mine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.

*Id.; see also Lanari* 827 P.2d at 502–03; *United States v. Rouco*, 765 F.2d 983, 995 (11th Cir.1985) (expert may be used if his testimony can offer something "beyond the understanding and experience of the average citizen"); *United States v. Burchfield*, 719 F.2d 356, 357 (11th Cir.1983) (expert testimony admissible where it is "the kind that enlightens and informs lay persons without expertise in a specialized field"). In determining whether the proffered testimony will appreciably assist the jury in performing its functions of evaluating evidence and making determinations of fact, the trial court must consider many factors. *Lanari*, 827 P.2d at 504. Among those considerations are the elements of the particular offense, the nature and extent of other evidence in the case, the expertise of the proposed expert witness, the sufficiency and extent of the foundational evidence upon which the expert witness' ultimate opinion is to be based, and the scope and content of the opinion itself. *Id.*

In *People v. Fasy*, 829 P.2d 1314 (Colo. 1992), we considered the admissibility of a psychologist's testimony concerning the victim's post-traumatic stress disorder. *Id.* at 1316. During an in camera hearing, the psychologist testified to the causes of the disorder, that the disorder has gained general acceptance in the medical field, that he had treated persons who suffered from the disorder, and that a sexual assault on a young child can cause the disorder. *Id.* at 1317. Finally, he testified that the victim suffered from the disorder and explained the basis for this diagnosis. *Id.* The trial court ruled that this testimony was admissible and qualified the witness as an expert in child psychology. *Id.* We agreed and held that this testimony was appropriate under CRE 702 because it placed the victim's post-assault behavior into context. *Id.* at 1316–17. In other words, the testimony provided an explanation outside the common knowledge of the jury for puzzling aspects of the child's conduct and demeanor. *Id.* at 1317. It was this ability to assist and inform the jury that made the testimony admissible under CRE 702.

Likewise, "federal courts have ordinarily allowed law enforcement officials 'to testify as experts ... to establish the *modus operandi* of particular crimes,' in order to 'explain the actions of the defendants.'" *United States v. Cross*, 928 F.2d 1030, 1050 (11th Cir.1991) (quoting *Burchfield*, 719 F.2d at 357). In *Cross*, the defendants were convicted of various counts related to their child pornography schemes. *Cross*, 928 F.2d at 1034. At trial, the court permitted an FBI agent, qualified as an expert on pedophilia, to explain the certain peculiar aspects of pedophile behavior. *Id.* at 1049. The expert was permitted to testify that certain pictures—that would appear innocent to the average juror—would appeal to the sexual interest of pedophiles and were obscene. He also testified that pedophiles often referred to such pictures by a code word, and in an attempt to circumvent child pornography and obscenity laws, these pictures, rather than more graphic ones, were published in magazines and distributed to pedophiles. *Id.* at 1049–50. Finally, the expert testified regarding pedophiles' obsession with exchanging stories and photographs with a network of others who share their sexual interest in children. *Id.* at 1050.

Considering the propriety of this testimony, the Eleventh Circuit opined that, "It is well settled that such expert testimony is permissible in an obscenity prosecution, particularly when contested materials are directed at such a bizarre deviant group that the experience of the trier of fact would be plainly inadequate to judge whether the material appeals to the prurient interest." *Cross*, 928 F.2d at 1050 (internal quotations omitted). Moreover, "[s]uch evidence clearly sheds light on one of the critical issues in the case—whether Cross obtained the photos with the intention of using them to produce and distribute child pornography." *Id.* Finally, the court reasoned that the testimony about pedophile networks "helped to explain the genesis and odd character of [the defendants'] relationship, particularly the fact that they had cooperated in a complex, risky,

criminal conspiracy although they had never met and knew little about one another." *Id.*

*United States v. Meeks,* 35 M.J. 64 (C.M.A. 1992), is perhaps the most similar federal case to the case before us. There, the military judge permitted an FBI investigator to provide the jury with his analysis of the physical aspects of the crime scene. 35 M.J. at 66. However, he was not allowed to opine that any particular individual committed the crime; nor was he allowed to testify about the physical characteristics that he would expect the perpetrator to have. *Id.* One of the opinions provided by the expert was that the perpetrator arrived at the crime scene with "sex and killing on his mind." *Id.*

The Court of Military Appeals affirmed. Interpreting Military Rule of Evidence 702, which was then identical to our Rule 702, it reasoned that "[a]nyone who has *substantive knowledge in a field beyond the ken of the average court member* arguably is an expert within that field." *Id.* at 67 (emphasis in original). In addition, the court noted that crime scene analysis, in which the witness was qualified as an expert, is generally recognized as a body of specialized knowledge. *Id.* at 68. The court then turned its attention to whether the testimony was helpful to the fact finder:

> The court members in this case were tasked with resolving a double homicide to which no eyewitnesses testified. The bodies were discovered in a horribly mutilated condition, raising questions as to the method and order of killing. The members, confronted with such a grotesque scenario, would be greatly assisted by a professional analysis of the crime scene in light of other murder cases. Moreover, extremely sophisticated observations were made by the agent, not elementary comments concerning well known criminal ventures. A homicide and its crime scene, after all, are not matters likely to be within the knowledge of an average court-martial member.

*Id.* at 68–69. Based on this reasoning, the court held that the military judge had not abused his discretion in determining that such evidence would assist the members. *Id.* at 69; *see also People v. Drake,* 129 A.D.2d 963, 514 N.Y.S.2d 280, 282 (1987) (noting an increasing trend to accept expert testimony explaining behavior not commonly understood by the average juror and holding in accordance therewith that the trial court properly admitted expert testimony concerning picquerism because it is a behavioral phenomenon not within the common knowledge of the average juror); *cf. also People v. Phillips,* 122 Cal.App.3d 69, 175 Cal.Rptr. 703, 712 (1981) (holding that the "existence, nature, validity, and applicability to these facts of the phenomenon characterized as 'Munchausen syndrome by proxy' are all matters sufficiently beyond common experience that expert opinion would assist the trier of fact"); *People v. Olguin,* 31 Cal. App.4th 1355, 37 Cal.Rptr.2d 596, 602 (1994) (holding that an officer's expert testimony on the sociology and psychology of gangs was admissible even though it encompassed ultimate issues in the case because the testimony related to matters "sufficiently beyond common experience to require interpretation by one having in-depth knowledge of street gangs"); *State v. Hester,* 114 Idaho 688, 692–93, 760 P.2d 27, 31–32 (1988) (proper for expert to testify that child had been sexually abused because whether a child has been sexually abused is "beyond common experience"). *But see State v. Stevens,* 78 S.W.3d 817, 835 (Tenn.2002) (holding that trial court did not abuse its discretion in excluding expert testimony that murder was a sexual homicide).

We have no doubt that Dr. Meloy's testimony assisted the jury "to either understand other evidence or to determine a fact in issue." *Lanari,* 827 P.2d at 502. Dr. Meloy testified that sexual homicides represent less than one percent of all homicides committed in the United States each year. If, as the court in *Meeks* opined, a homicide and its crime scene are not matters likely to be within the knowledge of average laypeople, then a sexual homicide and its crime scene are even less likely to be so.

Dr. Meloy's testimony also provided an explanation for the seemingly inexplicable. It is beyond dispute that the murder of Ms. Hettrick, like the *Meeks* and *Cross* cases, involved bizarre and deviant behavior that was unlikely to be within the knowledge of

ordinary citizens. This testimony placed the crime in context and explained puzzling aspects of the murder, such as the sexual mutilation. *See Fasy,* 829 P.2d at 1316–17. We thus agree with the trial court that permitting Dr. Meloy to explain the relevance of fantasy to sexual homicides and identify examples of Defendant's written productions that fell within the five categories of rehearsal "put into context the physical evidence surrounding the death of Ms. Hettrick and is valuable information that the jury is entitled to consider." Without the testimony of a specialist in this area, lay jurors would be tremendously disadvantaged in attempting to understand Defendant's motivation for killing Ms. Hettrick.

On this last point, we find *Phillips* persuasive. There the court approved of a psychologist's expert testimony explaining an obscure affliction termed "Munchausen Syndrome by proxy." *Phillips,* 175 Cal.Rptr. at 714. This syndrome, the prosecution theorized, supplied the motive for the crime. *Id.* at 708. The court opined:

> While a prosecutor ordinarily need not prove motive as an element of a crime, the absence of apparent motive may make proof of the essential elements less persuasive. Clearly that was the principal problem confronting the prosecutor here. In the absence of a motivational hypothesis, and in the light of other information which the jury had concerning her personality and character, the conduct ascribed to [the defendant] was incongruous and apparently inexplicable. As both parties recognize, [the psychologist's] testimony was designed to fill this gap.

*Id.* at 712 (citations omitted). Dr. Meloy's testimony was designed to fill precisely this same gap.

### 3. The trial court should not have excluded Dr. Meloy's testimony under CRE 403.

■ Our conclusion that the trial court properly admitted Dr. Meloy's testimony under CRE 702 does not end our inquiry. We explained in *Shreck* that in light of CRE 702's liberal standard of admissibility, "a trial court should also apply its discretionary authority under CRE 403 to ensure that the probative value of the evidence is not substantially outweighed by unfair prejudice." *Shreck,* 22 P.3d at 79; *see also Brooks v. People,* 975 P.2d at 1114 ("Even though the proffered testimony might be admissible under CRE 702, a court may still consider whether the probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of the evidence.").

First, we note that the trial court severely circumscribed the scope and extent of Dr. Meloy's testimony. Although, the trial judge's rulings permitted Dr. Meloy to discuss the concept of sexual homicide and identify the characteristics of the murder that were consistent therewith, he was not allowed to give opinions on ultimate issues of fact. For instance, he could not opine that Defendant committed the crime, that there was a particular likelihood that Defendant committed the crime, or that Defendant's written productions were evidence that he committed the crime. *See State v. Jackson,* 239 Kan. 463, 721 P.2d 232, 238 (1986) (stating that an expert's opinion, in a proper case, is admissible up to the point where an expression of opinion would require the expert to pass upon the credibility of witnesses or the weight of disputed evidence); *cf. State v. Hester,* 114 Idaho 688, 692–96, 760 P.2d 27, 31–35 (1988) (approving of expert testimony that child had been abused, and, in dicta, of expert testimony regarding traits typically exhibited by child abusers if offered for a relevant noncharacter purpose, but excluding expert testimony that identified defendant as the abuser). Similarly, the trial court permitted Dr. Meloy to testify hypothetically as to the type of events that might be a trigger for a sexual homicide, but not that any particular event is indeed a triggering event. Finally, the trial judge explicitly precluded Dr. Meloy from giving any opinions indicating that Defendant fit the characteristics—or profile—of a perpetrator of sexual homicide.

Furthermore, Defendant had a full and fair opportunity to cross-examine Dr. Meloy, and to present opposing views. Indeed, defense

counsel's cross-examination of Dr. Meloy was vigorous, and Defendant's own expert pointed out the weaknesses in the prosecution's theories and opinions. In addition, the trial court properly instructed the jury—both at the time of Dr. Meloy's testimony and again at close of evidence—that they were not bound by the testimony of experts, and that the testimony of expert witnesses is to be weighed as that of any other witness. *People v. Viduya,* 703 P.2d 1281, 1291 (Colo. 1985) (holding that the weight to be given an expert's opinion is for the jury to resolve); *Wise v. Hillman,* 625 P.2d 364, 367–68 (Colo. 1981) (same). Thus, assuming the maximum probative weight of Dr. Meloy's testimony, and its minimum prejudicial effect, *People v. District Court,* 869 P.2d 1281, 1285 (Colo. 1994), we conclude that his testimony should not have been excluded under CRE 403.

**4. Dr. Meloy's testimony was consistent with *Salcedo v. People,* 999 P.2d 833 (Colo.2000).**

Finally, we reject Defendant's argument that Dr. Meloy's testimony is inadmissible pursuant to *Salcedo v. People,* 999 P.2d 833 (Colo.2000). *Salcedo* considered only the narrow issue of whether the prosecution can offer "drug courier profiles" as substantive evidence of a defendant's guilt. *Id.* at 834. Even on this question we did not articulate a per se rule of exclusion. Instead, we identified certain aspects of the drug courier profile at issue in *Salcedo* that were inconsistent with the requirements of CRE 702, 401, 402 and 403, and therefore required the exclusion of that particular profile. *Id.* at 837–40.

First, in contrast to a profile comprised of an objective and articulable combination of behaviors and characteristics, the *Salcedo* profile depended on the "subjective, if not intuitive," judgment of the individual officer that was qualified as the expert. *Id.* at 838. We reasoned that "[t]he lack of evidence indicating that [the police officer] utilized an objective, widely recognized profile seriously undermined the likelihood that his testimony and opinions would assist the jury to determine Salcedo's state of mind at the time of his arrest." *Id.* at 839. Second, the prosecution had not proved that the profile was

reasonably reliable. *Id.* Accordingly, "[the officer's] profile may be highly reliable or totally unreliable as a predictor of whether a person is actually a drug courier." *Id.* Third, and perhaps most troubling, the behavior and characteristics constituting the profile applied equally to law-abiding citizens. *Id.* Therefore, their presence "does not tend to make it more or less probable that a person displaying those behaviors is a drug courier." *Id.* Accordingly, we concluded that "before drug courier profile evidence can be considered logically relevant to whether a person conforming to the profile is a drug courier, the prosecution must demonstrate that the behavior and characteristics that constitute the profile are relatively unique to drug couriers." *Id.* at 840. And finally, because the expert testified as both a factual witness and an expert witness—at times intermingling expert testimony concerning the behavior and characteristics that constituted the drug courier profile with eyewitness testimony concerning the defendant's actions and appearance—we concluded that there was a serious danger under CRE 403 that the jury would be misled by the expert's testimony. *Id.* For these reasons, we held that the drug courier profile at issue in *Salcedo* was inadmissible. *Id.*

We made clear, however, that "[o]ur holding in no way limits the admissibility of relevant evidence of a defendant's own behavior and characteristics." *Id.* "Evidence of a defendant's actions, demeanor, or appearance at the time he allegedly committed a crime generally is relevant to the defendant's state of mind. Evidence of the behavior and characteristics of previously observed drug couriers is not." *Id.*

Dr. Meloy's testimony was consistent with *Salcedo.* At its most basic level, *Salcedo* held, consistent with CRE 702, that drug courier profiles are inadmissible because they are unreliable and thus not helpful to the trier of fact. In contrast, Dr. Meloy's testimony was reasonably reliable and helpful to the jury. First, unlike the police officer who testified in *Salcedo,* Dr. Meloy is a board-certified doctor of forensic psychology. Far from the "subjective, if not intuitive," judgment of the individual officer that was

qualified as the expert in *Salcedo,* Dr. Meloy relied on an objective, widely-recognized psychological theory, one which was founded on research and study, and one which the trial court determined was generally recognized within the forensic community. His testimony consisted of an objective, complex, and highly developed analysis of the crime scene and Defendant's productions that had been refined by years of research. As such, it was reliable and insightful information that assisted the jury by placing the crime in context and helping them to understand bizarre and deviant behavior that was unlikely to be within the knowledge of ordinary citizens; it helped the jury understand the significance of material facts in the case.

Second, *Salcedo* made clear that its holding "in no way limits the admissibility of relevant evidence of a defendant's own behavior and characteristics." *See Salcedo,* 999 P.2d at 840. The majority of Dr. Meloy's testimony interpreted Defendant's own drawings and writings; this testimony is therefore outside of *Salcedo's* purview.

Third, the factors identified by Dr. Meloy as indicative of perpetrators of sexual homicide, including the role of rehearsal fantasy and trigger mechanisms, are not applicable to the average law-abiding citizen as was the drug courier profile at issue in *Salcedo.* On the contrary, they are "relatively unique" to perpetrators of sexual homicide.

Finally, unlike the police officer in *Salcedo,* Dr. Meloy testified only as an expert, not as a factual witness as well, and he was not allowed to opine on the ultimate issue of Defendant's guilt. In fact, he was not even permitted to testify that any of Defendant's drawings or narratives reflected Ms. Hettrick's murder or that any particular occurrence was indeed a precipitating event.

For these reasons, we conclude that Dr. Meloy's testimony was appropriate under CRE 702. *Cf. State v. Hester,* 114 Idaho 688, 694, 760 P.2d 27, 33 (1988) ("If relevant, it is generally permissible for experts to testify regarding traits typically exhibited by child abusers. Likewise, evidence that [the defendant] exhibits characteristics commonly found in child abusers would generally be admissible, if relevant. . . . [B]oth types of evidence are beyond the common experience of most jurors, and jurors would be assisted by such expert testimony." (internal quotations and citations omitted)).

## B. Whether the admission of Defendant's drawings and writings violated CRE 404(b).

Defendant next contends that pursuant to CRE 404, the trial court should have excluded Defendant's drawings and writings and all testimony pertaining thereto as impermissible character evidence. Defendant argues that the drawings and writings were evidence of Defendant's bad character which the prosecution was offering for the purpose of proving that he acted in conformity therewith when he murdered Peggy Hettrick. The prosecution responds that Defendant's drawings and writings, as well as the testimony pertaining to them, are admissible under CRE 404(b): they were not being offered to prove Defendant's character in order to show that he acted in conformity therewith but to prove his motive for the crime, his deliberation of the crime, his planning and preparation of the crime, his opportunity to commit the crime, and his subsequent knowledge of the crime.

The drawings and writings admitted at trial add up to more than 1000 pages. Each page was not admitted individually. Some productions were admitted as a single exhibit based on where they were discovered. For example, People's Exhibit 61 is a paper evidence bag which contained all the items taken from Defendant's backpack. The majority of the productions, however, were contained in notebooks, folders, or three-ring binders. The prosecutor admitted the entire notebook, folder or binder as a single exhibit. Certain drawings or portions of a narrative were tabbed and identified using the page number on which they appeared. These tabbed pages were referred to throughout the trial by various witnesses. People's Exhibit 90 provides a good example of the way in which the prosecution presented its evidence. The exhibit, a red spiral notebook taken from Defendant's bedroom, contained about 70 sheets of paper. Almost every page had something written on it.

Many pages contained homework assignments, notes from class, or mundane scribbles and doodles. Interspersed throughout the notebook were the drawings and writings at issue. Often, there were several drawings on a single page. Of the more than seventy pages, only eleven pages were tabbed and specifically referred to at trial. There were at least twenty notebooks, folders and binders admitted at trial which were similar to this exhibit. Each time, the prosecution specifically tabbed and referred to only a handful of the pages contained in the exhibit. Of the more than 1000 pages presented to the jury, there were less than 140 pages singled out by the prosecution.

Prior to trial, Defendant objected to the admission of the drawings and writings on the basis of CRE 404. The trial court overruled the objection. Defendant raised the same objection each time the prosecutor moved to introduce one of Defendant's productions. However, Defendant did not specifically object to the evidence on the grounds that it was cumulative and therefore unduly prejudicial under CRE 403. Notably, the Defendant did not ask the trial court to redact clearly irrelevant portions of the notebooks, such as Defendant's notes and homework assignments.

■ CRE 404(b) prohibits the admission of "other crimes, wrongs, or acts" when offered "to prove the character of a person in order to show that he acted in conformity therewith." CRE 404(b). There are three basic reasons CRE 404(b) excludes evidence of character when offered to prove that a criminal defendant acted in conformity therewith. First, there is the danger that the jury will convict a defendant to penalize him for his past deeds or simply because he is an undesirable person. *State v. Loebach*, 310 N.W.2d 58, 63 (Minn.1981). Second, there is the possibility that a jury will overvalue the character evidence in assessing the guilt for the crime charged. *Id.; see also Michelson v. United States*, 335 U.S. 469, 475–76, 69 S.Ct. 213, 93 L.Ed. 168 (1948) ("The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general

record and deny him a fair opportunity to defend against a particular charge." (internal footnotes omitted)). "Finally, it is unfair to require an accused to be prepared not only to defend against immediate charges, but also to disprove or explain his personality or prior actions." *Loebach*, 310 N.W.2d at 63.

■ In sum, there is a significant danger of unfair prejudice when evidence of bad character is admitted at trial. When character evidence is offered to show action in conformity therewith, this danger substantially outweighs its probative value for this purpose. Edward J. Imwinkelried, *Uncharged Misconduct Evidence* § 219, at 107 (rev. ed.2001). Accordingly, when offered for this purpose—often described as the defendant's propensity to commit a particular crime—evidence of other acts is always inadmissible. *See People v. Rath*, 44 P.3d 1033, 1038 (Colo.2002); *People v. Spoto*, 795 P.2d 1314, 1318 (Colo.1990) ("In other words, evidence of other crimes, wrongs or acts is inadmissible if the logical relevance of the proffered evidence depends upon an inference that a person who has engaged in such misconduct has a bad character and the further inference that the defendant therefore engaged in the wrongful conduct at issue.").

"When offered for any other purpose, however, the evidence is not necessarily barred." *Rath*, 44 P.3d at 1038; CRE 404(b); Mueller and Kirkpatrick, *supra* § 4.15, at 214 ("The rule adopts an inclusionary rather than exclusionary approach making evidence of prior crimes, wrongs, or acts potentially admissible subject to FRE 403, where offered for any relevant purpose that does not require an inference from character to conduct. Thus, FRE 404(b) does not require the proponent to force the evidence into a particular listed pigeonhole but only to show a relevant purpose other than proving conduct by means of the general propensity inference...."). Rule 404(b) itself lists "motive, opportunity, intent, preparation, plan, knowledge, [and] absence of mistake or accident" as examples of reasons for which evidence of other crimes may be admissible. CRE 404(b). " 'As the rule indicates, there are numerous other uses to which evidence of criminal acts may be put, and those enumerated are neither mutu-

ally exclusive nor collectively exhaustive.'" *Rath,* 44 P.3d at 1038 (quoting 1 Charles T. McCormick, *McCormick on Evidence* § 190, at 659) (John W. Strong, 5th ed.1999).

A trial court has substantial discretion in deciding whether to admit evidence of other "crimes, wrongs, or acts" for purposes other than to show that an accused acted in conformity with his bad character on a specific occasion, and only where there is an abuse of discretion will that ruling be disturbed. *People v. Willner,* 879 P.2d 19, 26 (Colo.1994); *see also People v. Ibarra,* 849 P.2d 33, 38 (Colo.1993).

We have developed a four-part test for trial courts to use when determining the admissibility of "other acts" evidence. *Spoto,* 795 P.2d at 1318; *Rath,* 44 P.3d at 1038. Such evidence is admissible if (1) it relates to a material fact; (2) it is logically relevant by tending to make that material fact more probable or less probable; (3) its logical relevance does not depend on the intermediate inference that CRE 404 prohibits—that the defendant committed the crime charged because of the likelihood that he acted in conformity with his bad character; and (4) its probative value is not substantially outweighed by its prejudicial impact. *Spoto,* 795 P.2d at 1318; *Rath,* 44 P.3d at 1038; *Willner,* 879 P.2d at 24. It is not sufficient for the party seeking admission of other acts evidence to merely list the litany of permissible uses for such evidence. On the contrary, the prosecution "must articulate a precise evidential hypothesis by which a material fact can be permissibly inferred from the prior act independent of the use forbidden by CRE 404(b)." *Spoto,* 795 P.2d at 1319.

1. *Spoto* analysis: The first three prongs

The prosecution presented multiple theories of logical relevance. First, pursuant to Dr. Meloy's testimony, Defendant's drawings and writings pairing sex and violence were relevant to Defendant's motive for the crime. Second, those drawings and writings that fall into the five categories of rehearsal fantasy as explained by Dr. Meloy were relevant to Defendant's deliberation of the crime. Third, Defendant's drawings and writings evincing a hatred of women were also relevant to Defendant's motive for the crime. Fourth, those drawings and writings reflecting specific aspects of Ms. Hettrick's murder were relevant to Defendant's preparation, planning, deliberation, or, if created after Ms. Hettrick was killed, guilty knowledge, of the crime. Fifth, drawings and writings concerning survival knives were relevant to Defendant's knowledge of such weapons. Finally, other drawings and writings, such as maps of the crime scene and a calendar with the date of the murder circled, were relevant to Defendant's opportunity to commit the crime, plan to commit the crime, preparation for the crime, or if created after the crime was committed, to Defendant's subsequent knowledge of the crime. Each of these theories of logical relevance is a precise evidential hypothesis by which a material fact—be it motivation, deliberation, preparation, planning, opportunity, or guilty knowledge—can be permissibly inferred from the drawings and writings independent of the prohibited character inference. Accordingly, the vast majority of the drawings and writings are admissible under the *Spoto* test. We now examine each of these theories of logical relevance in greater detail.

a. Sex-violence pairing and rehearsal fantasy categories

Although novel, the prosecution's first two theories of logical relevance—that those drawings and writings pairing sex and violence [1] are relevant to show Defendant's mo-

---

1. Examples of drawings and writings pairing sex with violence range from the subtle to the explicit. In one violent depiction the only reference to sex is the scrawled name of a particularly graphic pornography magazine. In another picture a skeletonized female states, "Someone raped and killed me, now I'm gonna get even." In a third drawing, a knife slices open what appears to be a vagina. One narrative entitled "A Day in Joe's

Life (A Love Story)" is perhaps the most explicit example of sex/violence pairing in Defendant's productions. It reads in its entirety:

As they made eye contact with one another their hearts each skipped a beat. She seemed to smile at him and batted her eyes. He cried "baby we're going to have some fun tonight"!

He swept her off her feet and hefted her high into the air. In a second his pants wre [sic] off

tive, and that those drawings and writings falling into the five categories of rehearsal fantasy[2] are relevant to show deliberation—meet the first two prongs of the *Spoto* test.

Material facts to which the other acts evidence must relate under the first two prongs of the *Spoto* test can be either "ultimate facts"—such as whether Defendant committed the crime, whether he possessed the requisite intent,[3] and whether he deliberated upon the murder—or "intermediate or evidential facts, themselves probative of ultimate facts." *See Rath,* 44 P.3d at 1039–40; *see also Vialpando v. People,* 727 P.2d 1090, 1095 (Colo.1986) ("[A] fact of consequence to the determination of the action also includes facts bearing circumstantially upon the weight or probative value to be given other evidence in the case." (internal quotations omitted)). "Plan, scheme, design, modus operandi, and motive, while not usually elements or ultimate facts themselves, are among, or closely related to, those examples of permissible reasons enumerated in the rule and are well-accepted methods of proving the ultimate facts necessary to establish the commission of a crime, without reliance upon an impermissible inference from bad character." *Rath,* 44 P.3d at 1040.

Here, Dr. Meloy testified that perpetrators of sexual homicide are often sexually aroused by their violent fantasies, and these fantasies can therefore become the "primary drive mechanism," or motive, for a sexual homicide. He further testified that fantasy productions may serve as a rehearsal for a sexual homicide. The trial court found that this testimony was reasonably reliable, and we have held that this conclusion was not manifestly erroneous.

Accordingly, pursuant to Dr. Meloy's testimony, those drawings and writings pairing sex and violence, as well as those falling into the five categories of rehearsal fantasy, are logically relevant to whether Defendant had motive to commit the crime, and whether Defendant prepared to commit the crime. Defendant's motive and preparation are themselves relevant to the ultimate issues of whether he committed the actus reus of the crime, and whether he did so with the requisite intent and deliberation. Because they are evidence of motive and deliberation, those drawings and writings pairing sex with violence, as well as those falling into the five categories of rehearsal fantasy identified by Dr. Meloy, are logically relevant to material facts in the case and therefore satisfy the first two prongs of the *Spoto* test. *Willner,* 879 P.2d at 26–27 (evidence of prior bad acts admissible under *Spoto* to prove intent and deliberation).

Because the logical relevance of this chain of inference does not rely on Defendant's

and Joe was stuffing his new found girlfriend between his buttox [sic] and up his sphincter.

2. According to Dr. Meloy, narratives and drawings of surprise or blitz attacks constitute the situational element of Defendant's rehearsal fantasy. Drawings and writings of victims being stabbed or sliced—evidence of Defendant's picquerism—are consistent with the paraphilic element of Defendant's rehearsal fantasy. Drawings and writings of vulnerable females reflect the demographic element of Defendant's rehearsal fantasy. Drawings and writings in which the victim is a stranger or casual acquaintance of the perpetrator are the relational component of Defendant's fantasies. Finally, narratives detailing the actions of the two fictional characters with whom Defendant identified himself represent the self-perceptual element of Defendant's fantasies.

3. We, like the court of appeals, reject Defendant's argument that intent is not a material issue to which his drawings and writings are logically relevant because it can be implied from the nature of the crime. In *People v. Snyder,* 874 P.2d 1076, 1079 (Colo.1994), we reversed the

court of appeals' conclusion that intent was not a material issue within the meaning of the first prong of the *Spoto* test because it was necessarily implied from the nature of the alleged acts. We reasoned that because the prosecution must prove each element of an offense beyond a reasonable doubt, "[t]he state has a right to prove each of these elements unless the defendant stipulates to facts establishing one or more elements and the prosecution's case is not weakened by acceptance of such a stipulation. . . ." Accordingly, because intent was an element of the crime charged, we held that it was a material fact that satisfied the first prong of the *Spoto* analysis. Similarly, in *Rath,* we reasoned that the uncontested nature of a material fact "does not make the fact itself any less material or the evidence offered to prove it any less logically probative." *Rath,* 44 P.3d at 1040. It does, however, affect "the need for or incremental probative value of the evidence offered to prove it," *id.,* but this consideration is relevant to the fourth, not first, prong of the *Spoto* test.

propensity to act a certain way, the third prong of *Spoto* is likewise satisfied.[4] Murderers "often have bizarre motivations for their conduct—motivations that would not readily occur to most jurors." Edward J. Imwinkelried, *People v. Ewoldt: The California Supreme Court's About–Face on the Plan Theory for Admitting Evidence of an Accused's Uncharged Misconduct,* 28 Loy. L.A. L.Rev. 473, 483 (1995) (internal footnotes omitted). Accordingly, many acts appearing at first blush to be unrelated character evidence are in actuality elements of a common scheme "hatched by a warped criminal mind." *Id.* (noting that "[t]he accused written or oral statements may be evidence that the accused harbored such a plan" (internal quotations omitted)). As such, the seemingly unrelated acts are being offered for a relevant noncharacter purpose and thus should be admissible under CRE 404(b). *Id.* This case is demonstrative of this point.

Through Dr. Meloy's testimony, the prosecution established that these drawings and writings actually established Defendant's motive for the crime and may also have served as preparation for the crime. Motive and preparation are the relevant noncharacter purposes for which the drawings and writings were offered. The logical relevance of the drawings and writings to show motive and preparation does not depend on the inference that the defendant committed the crime charged because of the likelihood that he acted in conformity with his bad character. Admission of the writings and drawings

to prove motive and preparation therefore satisfies the third prong of the *Spoto* test.

#### b. Hatred of Women

Defendant's drawings and writings evincing a hatred of women[5] also satisfy the first three prongs of the *Spoto* test. They are evidence of motive. Although we have never before considered whether evidence of misogyny can be admitted under CRE 404(b), we find support for our conclusion in the jurisprudence of other states. In *People v. Hoffman,* 225 Mich.App. 103, 570 N.W.2d 146 (1997), the Michigan Court of Appeals considered whether "other-acts evidence" tending to establish the defendant's hatred of women could be admitted pursuant to Michigan Rule of Evidence 404(b).[6] The court defined motive as "the cause or reason that moves the will and induces action." *Hoffman,* 570 N.W.2d at 148 (quoting Black's Law Dictionary (rev. 5th ed.)). The court admitted that "[t]he distinction between admissible evidence of motive and inadmissible evidence of character or propensity is often subtle." *Id.* However, there is a distinction, and the court offered a hypothetical to demonstrate it. A white assailant attacks a black man. The assailant makes no demands and takes no money or property; the assailant and the victim do not know each other. The crime is seemingly an inexplicable act of random violence. Later, when the assailant is arrested and charged with the crime, the prosecutor discovers that the defendant has attacked

---

4. As is the case here, evidence of other acts often suggests bad character and action in conformity therewith. However, "[t]he third prong of the *Spoto* test does not demand the absence of the inference but merely requires that the proffered evidence be logically relevant independent of that inference." *People v. Snyder,* 874 P.2d 1076, 1080 (Colo.1994); *accord People v. Willner,* 879 P.2d 19, 28 (Colo.1994). Nevertheless, when the inference of action in conformity with bad character is present, "the prosecution may not exploit that inference but must restrict its use of the evidence to the purposes for which it was admitted." *Willner,* 879 P.2d at 28. Otherwise, the prosecution risks a determination that the probative value of the evidence is substantially outweighed by its prejudicial effect. We are satisfied by our review of the record, that the prosecution appropriately limited its use of the other acts evidence. In closing, the prosecution ar-

gued that Defendant's fantasies were the "primary-drive mechanism" for the murder and that he was rehearsing the murder in the drawings and writings. This was within the scope of the purposes for which the drawings and writings were admitted.

5. There are many drawings and writings reflecting Defendant's hatred of women. In one, a man hammers a nail through the tongue of a sexualized female. The caption accompanying the drawing exclaims "Bitch." In another, a younger man shoots an elderly lady in the chest. She falls backwards as her cane and purse fly into the air and blood spews from the wound. The caption accompanying the drawing reads, "Fucking old ladies."

6. This rule is identical to CRE 404(b).

several other people in the past. The court reasoned:

> Absent a proper purpose (such as to prove a common plan, scheme, or other exception), this other-acts evidence would be inadmissible because its only relevance is to establish the defendant's violent character or propensity towards violence. However, if ... all the defendant's prior victims were African–American and [the] defendant had previously expressed his hatred toward blacks, then the evidence of the defendant's prior assaults would be admissible to prove the defendant's motive for his conduct. By establishing that the defendant harbors a strong animus against people of the victim's race, the other-acts evidence goes beyond establishing a propensity toward violence and tends to show why the defendant perpetrated a seemingly random and inexplicable attack.

*Id.* at 149. Based on this line of reasoning, the court concluded that "evidence that defendant hates women and previously had acted on such hostility establishes more than character or propensity. Here, the other-acts evidence was relevant and material to defendant's motive for his unprovoked, cruel, and sexually demeaning attack on his victim." *Id.* But see State v. Johnson, 71 Ohio St.3d 332, 643 N.E.2d 1098, 1105 (1994) (holding that hatred of women indicates evidence of a character trait that must be excluded). Reasoning that "[a]bsent the other-acts evidence establishing motive, the jurors may have found it difficult to believe the victim's testimony that defendant committed the depraved and otherwise inexplicable actions," the Michigan Court of Appeals also held that the trial court did not abuse its discretion in ruling that the danger of unfair prejudice did not substantially outweigh the probative value of the other-acts evidence. *Id.* at 149–50.

*Hoffman* drew its hypothetical, and its reasoning from *State v. Crumb,* 277 N.J.Super. 311, 649 A.2d 879 (1994). There, the court reversed the trial court and held that evidence of a defendant's bigotry was admissible to establish the defendant's motive for randomly attacking an elderly black man. *Crumb,* 649 A.2d at 884. This evidence consisted of drawings and writings produced by the defendant that sanctioned white supremacy and contained various racial epithets. *Id.* at 881.

The court reasoned that a wider range of evidence should be admissible to establish motive or intent than is permitted in support of other issues because "[o]therwise there would often be no means to reach and disclose the secret design or purpose of the act charged in which the very gist of the offense may consist." *Id.* at 882. Accordingly, the court held that "[a]ll evidentiary circumstances, which are relevant to or tend to shed light on the motive or intent of the defendant or which tend fairly to explain his actions are admissible in evidence against him although they may have occurred previous to the commission of the offense." *Id.* (internal quotations omitted). Reasoning that the written material expressing defendant's hostility toward and hatred of black people "is compelling powerful evidence of a motive which helps explain an otherwise inexplicable act of random violence," the court held that the evidence was admissible. *Id.; cf. United States v. Mills,* 704 F.2d 1553 (11th Cir.1983) (holding that evidence of other acts is admissible if "it is linked together in time and circumstances with the crime charged, or if it forms an integral and natural part of the account of the circumstances of the crime, or is necessary in order to complete the story of the crime on trial," and therefore affirming the trial court's admission of evidence establishing defendant's membership in the Aryan Brotherhood because it formed the "context, motive, and set-up for the crime" and was necessary to "make the crime comprehensible to a jury" (internal citations and quotations omitted)); *cf. also People v. Nicolaus,* 54 Cal.3d 551, 286 Cal.Rptr. 628, 817 P.2d 893, 906–07 (1991) (holding that writings of the defendant revealing his extreme dislike of religion, and in particular Christianity, were admissible to prove motive); *People v. Olguin,* 31 Cal.App.4th 1355, 37 Cal.Rptr.2d 596, 601 (1994) (holding that evidence of gang activity and affiliation is admissible where it is relevant to issues of motive and intent).

We are persuaded by the reasoning of *Hoffman* and *Crumb.* Dr. Meloy testified

that one of the primary reasons perpetrators of sexual homicide fantasize is to express deeply felt hostility towards women. This hostility eventually crescendos into a sexual homicide where the female victim is degraded, treated as a sex object, and sexually mutilated. Thus, Defendant's hatred of women, as exemplified in many of his drawings and writings, is not just a motive for the crime, but for why the crime was committed in this specific manner. *Cf. People v. Mendoza*, 876 P.2d 98, 103 (Colo.App.1994) (holding that evidence of gang affiliation was admissible as motive where it was offered not to prove that defendant was more likely to kill because he was a gang member, but because his membership in a particular gang established a motive for why he was more likely to murder a particular victim after deliberation). As such, Defendant's drawings and writings reflecting his hatred of women satisfy the first three prongs of the *Spoto* test.

### c. Specific aspects of the crime, knives, hand crime scene evidence

Some of Defendant's drawings and writings reflect specific aspects of the murder. For example, pools of blood, bloody drag trails, distinctive scratch marks on victims' faces, and victims with their arms positioned above their heads can be found throughout Defendant's productions. In one instance, there is a picture of an assailant dragging a victim by the armpits; blood drips from her back, and her heels leave a bloody drag trail behind. Forensic investigators suspect that this is precisely how Peggy Hettrick was moved from the street into the field where she was found.

There is no need for an extended discussion of why these productions were admissible. We agree with the court of appeals that these drawings and writings are sufficiently similar to the actual crime to be admissible under CRE 404(b) independent of Dr. Meloy's testimony—although his testimony that fantasy can serve as a rehearsal for the crime certainly bolsters this conclusion. If

created before the crime was committed, the drawings and writings reflecting aspects of the crime constitute evidence of Defendant's preparation for and planning of the crime, and thus ultimately of his deliberation and intent. *See Longoria v. Nevada*, 99 Nev. 754, 670 P.2d 939, 940 (1983) (holding that both defendant's planning activity and the manner of killing as it bears upon a pre-existing reflection to take the victim's life in a particular way are relevant to premeditation and deliberation). If created after the commission of the crime, these drawings and writings are evidence of Defendant's subsequent knowledge of the crime and thus of his identity as the perpetrator.[7] *See Kennard v. People*, 171 Colo. 194, 465 P.2d 509, 511 (1970) ("As concerns the issue of intent and guilty knowledge and the relationship thereto of evidence of other offenses, what one does after his alleged commission of a criminal act may be as revealing as that which he has done before."); *see also People v. Lamirato*, 180 Colo. 250, 504 P.2d 661, 665 (1972) (upholding the admission of evidence that defendant committed theft three days after the offense for which he was charged for the purpose of showing "plan, scheme, design, intent or guilty knowledge."); *People v. Snyder*, 874 P.2d 1076, 1077–1081 (Colo.1994) (upholding the admission of subsequent sexual assault for the purpose of proving plan, motive, and intent to commit prior sexual assault). Both of these evidentiary hypotheses are independent of the prohibited propensity inference.

Likewise, many of Defendant's drawings are detailed depictions of survival knives similar to the knife which investigators and the coroner believe was used to kill Peggy Hettrick. These drawings and writings are admissible to prove Defendant's knowledge of such weapons. Other drawings and writings, such as maps of the crime scene and a calendar with the date of the murder circled, are patently relevant to Defendant's opportunity to commit the crime, plan to commit the crime, preparation of the crime or, if created after the crime was committed, of his subse-

---

7. The relevance of Defendant's post offense productions is further supported by Dr. Meloy's testimony that perpetrators of sexual homicide

would continue to have violent sexual fantasies and dwell on events related to the crime long after its commission.

quent knowledge of the crime.[8] The relevance of these productions is also independent of the prohibited propensity inference.

### 2. *Spoto* analysis: The fourth prong

 The fourth prong of the *Spoto* analysis requires us to determine whether the probative value of the evidence is substantially outweighed by its prejudicial effect. The trial court is accorded considerable discretion in this determination, and we will not disturb its ruling on appeal absent an abuse of discretion. *People v. Dist. Court*, 869 P.2d 1281, 1285 (Colo.1994). To demonstrate an abuse of discretion, Defendant must show that the trial court's decision was manifestly arbitrary, unreasonable, or unfair. *People v. Nuanez*, 973 P.2d 1260, 1263 (Colo.1999). In deference to the trial court's exercise of discretion, a reviewing court "assume[s] the maximum probative value that a reasonable fact finder might give the evidence and the minimum unfair prejudice to be reasonably expected." *People v. Lowe*, 660 P.2d 1261, 1264 (Colo.1983).

 We have observed that this test, encapsulated in CRE 403, "strongly favors the admission of evidence." *See, e.g., People v. Dist. Court*, 869 P.2d at 1286 (Colo.1994); *see also United States v. Dennis*, 625 F.2d 782, 797 (8th Cir.1980) (stating that "balance should be struck in favor" of admissibility). By requiring that the probative value of the evidence in question be "substantially outweighed" by the danger of unfair prejudice, the rule makes clear that the need for exclusion must be great, "since exclusion is a drastic remedy and less restrictive measures, such as cautionary instructions to the jury, may suffice to reduce the danger of prejudice to an acceptable level." *People v. Dist. Court*, 785 P.2d 141, 147 (Colo.1990) (internal quotations omitted). Moreover, evidence is not "unfairly prejudicial" simply because it damages the defendant's case. "All effective evidence is prejudicial in the sense of being damaging or detrimental to the party against whom it is offered." *Id.* at 147. Accordingly, "proffered evidence which calls for exclu-

sion as unfairly prejudicial is given a more specialized meaning of an undue tendency to suggest a decision on an improper basis, commonly but not necessarily an emotional one, such as sympathy, hatred, contempt, retribution, or horror." *Id.* As the Fifth Circuit aptly observed:

> Relevant evidence is inherently prejudicial; but it is only *unfair* prejudice, *substantially* outweighing probative value, which permits exclusion of relevant matter under Rule 403. Unless trials are to be conducted as scenarios, or unreal facts tailored and sanitized for the occasion, the application of Rule 403 must be cautious and sparing. Its major function is limited to excluding matters of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect.

*United States v. McRae*, 593 F.2d 700, 707 (5th Cir.1979) (emphasis in original).

 "The balancing required by Rule 403 contemplates the consideration of such factors as the importance of the fact of consequence for which the evidence is offered, the strength and length of the chain of inferences necessary to establish the fact of consequence, the availability of alternative means of proof, whether the fact of consequence for which the evidence is offered is being disputed, and, if appropriate, the potential effectiveness of a limiting instruction in the event of admission." *Vialpando*, 727 P.2d at 1096.

The admission of Defendant's drawings and writings certainly had the potential for unfair prejudice. However, the drawings and writings also had substantial probative worth. As our preceding discussion indicates, the drawings and writings were essential to the prosecution's theory of the case. They establish the motive for the crime; they indicate preparation for the crime; they reflect Defendant's knowledge of the crime; and they provide a basis by which the jury can evaluate the weight it should give Dr. Meloy's testimony. *See Vialpando*, 727 P.2d at 1096 (holding that evidence should not have been excluded under CRE 403 in part

---

**8.** While being interrogated Defendant told an investigator that "if I did this, I'd blow my brains out." Thus, drawings and writings pertaining to suicide are logically relevant to whether Defendant committed the crime.

because doing so would "deprive[ ] the defendant's expert witnesses of an important foundational component which the jury might well have utilized in evaluating the validity of the opinion evidence elicited during the trial").

Indeed, Defendant's drawings and writings provide a plausible explanation for Peggy Hettrick's death. *Cf.* Imwinkelried *supra,* § 6:12 (commenting that evidence of other acts is admissible to explain relevant conduct where explanation for the conduct is actually needed). Dr. Meloy testified that unlike many other types of homicides, where a motive may be fairly obvious, the motive in a sexual homicide is typically "intrinsic, internal, [and] very psychological for the individual." The prosecution theorized that not only do Defendant's fantasy productions reveal his motive for the crime but they may have actually served as a rehearsal for it as well. As we have explained, whether Defendant had a motive to commit the crime and whether he prepared for the commission of the crime are directly relevant to whether Defendant committed the actus reus of the crime, whether he did so with the requisite intent, and whether he deliberated prior to committing the crime—all elements of the offense that the prosecution must prove beyond a reasonable doubt in a first degree murder case. The drawings and writings were essentially the only way to prove these elements. With these drawings and writings, and Dr. Meloy's interpretation thereof, the prosecution was able to present a cogent and plausible theory of the crime. Without them, the jury would be faced with deciding whether Defendant is guilty of a seemingly inexplicable act of random violence.

Finally, we note that defense counsel did not request a limiting instruction when this evidence was introduced, and at the close of evidence, when the trial court offered to instruct the jury on the limited purpose for which this evidence could be considered, defense counsel refused. *Cf. People v. Gladney,* 194 Colo. 68, 71–72, 570 P.2d 231, 233 (1977) (observing that defense counsel often

chooses not to request a limiting instruction for strategic or tactical reasons, and therefore holding that a trial court's failure to give such an instruction on its own motion is not reversible error). Given the importance of the drawings and writings to the prosecution's theory of the case, and the absence of alternative means of proof available, we conclude that admitting the vast majority of the drawings and writings was not an abuse of discretion.

### 3. Inadmissible character evidence

█ Although the vast majority of drawings and writings are admissible under the theories of logical relevance we have discussed, there are a few drawings and writings that are nothing more than evidence of Defendant's violent nature. These drawings and writings do not pair sex with violence, do not fall into one of the five categories of rehearsal fantasy, do not evince a hatred of women, do not reflect specific aspects of the crime, and thus do not reveal defendant's motive, preparation, plan, opportunity, or guilty knowledge. Accordingly, the only possible chain of inference the jury could have drawn from these productions was that Defendant had a bad character and killed Peggy Hettrick because of it. This is, of course, the precise inference prohibited by Rule 404, and the admission of these drawings was erroneous.[9]

█ That error, however, was harmless. CRE 103(a) provides that "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected." CRE 103(a). Likewise, C.A.R. 35(e) instructs appellate courts to disregard any error not affecting substantial rights of parties. "The harmless error rule is an obvious recognition of the fact that '[a] perfect trial is an impossibility and minor mistakes will inevitably occur.'" *People v. Gaffney,* 769 P.2d 1081, 1088 (Colo. 1989) (quoting *Callis v. People,* 692 P.2d 1045, 1053 (Colo.1984)). "The proper inquiry in determining a harmless error question is

---

**9.** Examples of Defendant's productions that were erroneously admitted include war scenes—some of which appear to sanction Nazi Germany—skeletons, guns, a duck with a firecracker tied to it, "maggot-patch kids," a hanging, and a person being hit by a car. There were also some productions reflecting Defendant's dislike of various ethnic groups, cultures, or lifestyles.

not whether there was sufficient evidence to support the verdict without the improperly admitted evidence, but, rather, whether the error substantially influenced the verdict or affected the fairness of the trial proceedings." *Id.; accord Callis,* 692 P.2d at 1053. "If a reviewing court can say with fair assurance that, in light of the entire record of the trial, the error did not substantially influence the verdict or impair the fairness of the trial, the error may properly be deemed harmless." *Id.; accord, Tevlin v. People,* 715 P.2d 338, 341 (Colo.1986); *People v. Quintana,* 665 P.2d 605, 612 (Colo.1983).

There were more than 1000 pages of Defendant's drawings and writings admitted at trial. Most of the drawings and writings were created in spiral notebooks or kept in three-ring binders which were admitted into evidence in their entirety. Several of these notebooks or binders contained one or a handful of drawings or writings that, under *Spoto,* should not have been admitted. However, the vast majority of these pages were properly admitted under CRE 404(b). The improperly admitted pages were not emphasized or relied on by the prosecution in presenting its case.

In addition to the writings and drawings, the prosecution presented substantial other evidence linking Defendant to the murder. First, Defendant's behavior on the morning after the murder aroused suspicion. By his own admission, Defendant was at the crime scene on the morning after the murder. Rather than report his finding to the police, he went to school as if he found nothing at all. Second, the murder occurred around the fourth anniversary of his mother's sudden death. Both the victim and Defendant's mother had long, wavy red hair and Defendant admitted to seeing the victim around the neighborhood. Third, the crime was likely committed by a left-handed individual. Defendant was left-handed. Fourth, the crime required specialized weapons: a serrated knife and a scalpel. Defendant owned six survival knives and at least one of the knives contained a scalpel. Fifth, Defendant told a detective that he had thought about committing this type of murder in the past. Finally, Defendant knew specific details about the crime scene—such as the color of the victim's socks or the manner in which she was dragged—that he would not have been able to learn solely by seeing the victim the next morning.

Many of the inadmissible productions which we find harmless were, admittedly, violent. However, to determine whether the admission of a particular drawing or writing was harmless, we must look at the entire record. The jury received hundreds of pages of drawings and writings which we have concluded were properly admitted under CRE 404(b). These productions contained scenes of sex and violence, blitz attacks, piquerism, attacks against strangers, and violence against women. Obviously, these productions contained a substantial level of violent fantasies. We conclude, based upon the totality of the evidence presented in this case, that this jury, having been exposed to violent images through admissible evidence, was not substantially influenced by similar images of violence contained in the inadmissible productions.

We also note that many of Defendant's productions contained evidence of his prejudices. Defendant harbored prejudice, to some degree, against nearly every culture, lifestyle, or ethnicity other than his own. His prejudices were typically exhibited by the sporadic use of ethnic slurs. Occasionally, his productions cast a particular minority group as the target of violence. The trial court, had Defendant requested, would likely have required the prosecutor to redact the inflammatory language prior to presenting the drawing or writing to the jury. Defendant made no such request. Simply because evidence of Defendant's prejudice came before the jury we are not automatically required to find reversible error. The question is whether the jury's exposure to Defendant's prejudices substantially influenced their verdict or affected the fairness of the proceedings. In this case, we conclude that the answer is no. The evidence of Defendant's prejudices was not so overwhelming that it substantially influenced the outcome of the trial or affected the fundamental fairness of the proceedings. We do not believe that the jury's passions were so inflamed by the evi-

dence of Defendant's prejudices that it was unable to overlook the ethnic slurs. The court instructed the jury to reach its verdict based on a fair and impartial evaluation of the evidence presented. We conclude that the evidence supports the jury's verdict beyond a reasonable doubt and we give that verdict its effect. *See Stewart v. Rice*, 47 P.3d 316, 322 (Colo.2002) (noting that we will defer to a jury's verdict when the jury is properly instructed and the record contains evidence to support their findings).

In light of the entire record, we can say with fair assurance that the erroneous admission of the inadmissible evidence did not substantially influence the verdict or impair the fairness of the trial. This error was therefore harmless.

**C. Whether the admission of evidence of a confrontation between the defendant and a schoolteacher violated CRE 404(b).**

██ Approximately one month before Peggy Hettrick's murder, Defendant became enraged when his schoolteacher confiscated a military manual from him. At trial, the prosecution was allowed to provide details of this incident through the testimony of the teacher and Defendant's former guidance counselor, who was also involved. Defendant argues that this testimony was impermissible character evidence. We disagree.

Dr. Meloy opined that sexual homicides are often preceded by a "triggering mechanism" or "precipitating event" that causes the perpetrator to transform his fantasies into action. Although the trial court prohibited Dr. Meloy from testifying that any particular event in Defendant's life was a triggering mechanism, he was allowed to testify hypothetically as to the types of occurrences that could serve as a trigger mechanism. One such hypothetical example was a conflict or confrontation with adult women in positions of authority in an employment or educational environment. The jury was left to draw the inference that Defendant's confrontation with his teacher was the precipitating event for Ms. Hettrick's murder itself.

Like the drawings and writings, the admissibility of evidence concerning the school inci-

dent depends largely on the testimony of Dr. Meloy. Dr. Meloy's testimony that such an incident could serve as a precipitating event for a sexual homicide, makes Defendant's escalating anger and aggression towards older women probative of his motive for the crime, and, given that it occurred approximately one month before Ms. Hettrick's murder, of his preparation or plan to commit the crime. Again, evidence of motive and preparation are relevant to the ultimate issues of whether Defendant committed the actus reus of the crime with the requisite intent and deliberation. Therefore, the logical relevance of the incident does not depend on the inference that defendant committed the crime charged because of the likelihood that he acted in conformity with his bad character. Finally, for the same reasons the admission of the drawings and writings satisfy the fourth prong of the *Spoto* test, we conclude that the trial court did not abuse its discretion in finding that the prejudicial effect of the school incident did not substantially outweigh its probative value. Accordingly, we hold that evidence of the school incident was not improperly admitted.

## III. CONCLUSION

For the above reasons, we affirm the judgment of the court of appeals.

Justice BENDER dissents, Chief Justice MULLARKEY and Justice MARTINEZ join in the dissent.

Justice BENDER, dissenting:

The majority approves the mass admission of over a thousand pages of the defendant's writings and drawings, many of which are repulsive and antisocial and others which are a high school student's routine notebooks, assignments and doodles. Most of these writings and drawings have nothing to do with this grisly murder but instead paint the defendant as a boy obsessed with violence. Although I believe that proof of some of the defendant's fantasies is admissible, many are not. The sheer volume of the inadmissible evidence so overwhelmed the admissible evidence that the defendant could not have a fair trial.

In my view the majority's opinion, which admits all of the defendants' writings and drawings, does great injustice to the purposes of C.R.E. 404(b) and opens doors to impermissible character evidence that previously had been closed. Because there exists a substantial risk that the defendant was convicted not for what he did, but for who he is, I respectfully dissent.

## Discussion

The Colorado Rules of Evidence expressly forbid the use of character evidence to infer conduct. "Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion." C.R.E. 404(a). The underlying purpose of this prohibition is to ensure that a person is judged according to what he has done, and not by who he is, i.e., his character. *People v. Garner,* 806 P.2d 366, 369 (Colo. 1991) ("[E]vidence of similar acts has inhering in it damning innuendo likely to beget prejudice in the minds of jurors ....")(internal citations omitted).

If the fact-finder is told, for instance, that a murder defendant acted violently in the past, he might infer that the defendant should be penalized for the murder because he is a violent person who figuratively or literally "got away with murder" in the past. *See* David P. Leonard, *Character and Motive in Evidence Law,* 34 Loy. L.A. L.Rev. 439, 450 (2001)("The admission of character evidence, particularly evidence of a person's past misdeeds ... invit[es] the fact finder to judge the person rather than the person's charged acts."). This inference is likely with other acts evidence because juries tend to overvalue it. *See Michelson v. United States,* 335 U.S. 469, 475–76, 69 S.Ct. 213, 93 L.Ed. 168 (1948)(finding that the issue is not that character evidence is irrelevant, but rather that it "weigh[s] too much with the jury" so as to overpersuade them to prejudge one with a bad general record and deny him a fair opportunity to defend himself).[1] There is a danger that the "presumption of innocence" operates only for the accused with a spotless past.[2] Moreover, prior bad acts are poor predictors of future behavior.[3]

Given the dangers, if evidence is offered to show that a person has a particularly bad character trait, and acted according to that trait, then the evidence is always inadmissible. *People v. Rath,* 44 P.3d 1033, 1038 (Colo.2002)(finding that character evidence is always inadmissible to prove conduct, consistent with the long-standing policy of American and English evidence law). Proof of character is excluded because it may lead a jury to convict the accused on the ground of bad character deserving punishment, irrespective of guilt of the crime charged. *Garner,* 806 P.2d at 369; *see also* Edward J. Imwinkelried, *Uncharged Misconduct Evidence* § 219, at 105 (rev. ed.2001).

In certain situations, however, it is appropriate and highly relevant for the fact-finder to consider evidence of "other crimes, wrongs or acts" to infer conduct when it is admitted to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence

1. The tendency of juries to overvalue other acts evidence is supported by empirical studies. *See* James E. Beaver & Steven L. Marques, *A Proposal to Modify the Rule on Criminal Conviction Impeachment,* 58 Temp. L.Q. 585, 602–03 (1985)(summarizing the findings of several empirical studies on jury behavior regarding a defendant's prior record and finding that "the distaste jurors may have for the defendant's past activities may also tend to distort their perception of the degree of independent evidence necessary to meet the prosecution's burden of proving guilt beyond a reasonable doubt" and concluding that social scientists' studies reveal that "when an individual is told negative things about another person, that individual is going to assume other negative things.").

2. *See* Harry Kalven, Jr. & Hans Zeisel, *The American Jury* 160–61, 178–79 (1966); Comment, *Other Crimes Evidence at Trial: Of Balancing and Other Matters,* 70 Yale L.J. 763, 777 (1961) ("The jurors almost universally used defendant's record to conclude that he was a bad man and hence was more likely than not guilty of the crime for which he was then standing trial.")(internal citations omitted).

3. *See* Miguel A. Mendez, *California's New Law on Character Evidence: Evidence Code Section 352 and the Impact of Recent Psychological Studies,* 31 UCLA L.Rev. 1003, 1049 (1984) ("Evidence of specific acts of misconduct used to prove the accused's guilt ... is simply too unrepresentative to support the inferences jurors are likely to draw.").

of mistake or accident." C.R.E. 404(b); *Rath,* 44 P.3d at 1038–39. This positive authorization, however, must always be tempered by the prohibitions found in 404(a) and 404(b) against admitting character evidence.

Specifically, under the "third-prong" of the *Spoto* test, a court must evaluate whether the logical relevance of the proffered other acts evidence is independent of the intermediate inference that the defendant has a bad character. *People v. Spoto,* 795 P.2d 1314, 1318–19 (Colo.1990); *Rath,* 44 P.3d at 1038. This requirement means more than a statement by the prosecutor or the court that the "other acts evidence is independent of the intermediate inference that the defendant has a bad character." The prosecution must "articulate a *precise* evidential hypothesis by which a material fact can be permissibly inferred from the prior act independent of the use forbidden by C.R.E. 404(b)." *Spoto,* 795 P.2d at 1319 (emphasis added). The same is true for the trial court. *Spoto* provides a specific analytical framework to evaluate whether uncharged misconduct evidence should be admitted under 404(b).

*Spoto* was a murder case in which the defendant and his friend entered the victim's bedroom in the middle of the night and the defendant subsequently shot the victim in the neck, killing him. The defendant did not dispute that he shot the victim but argued that the gun fired accidentally in the course of a struggle. 795 P.2d at 1316.

The other act at issue in that case occurred a few weeks earlier in the defendant's house. The defendant and the same friend went into the bedroom of two other housemates at night to determine if the housemates had taken some missing items in the house. According to one of the housemates, the defendant woke him up by poking him in the ribs with the gun, pulling his left arm outward, and pressing a gun to his head. The trial court admitted the uncharged act without analysis. *Id.* at 1316–17.

We noted that whether the uncharged act was logically relevant independent of the inference prohibited by 404(b) was a "difficult question." *Id.* at 1319. We then identified the forbidden character inference that might occur: the prior gun incident shows that the

defendant is a person who draws guns on people intentionally and therefore he must have intentionally shot the victim in the charged case simply because he is the type to draw a gun. We next compared the value of this prior act to prove that the defendant committed the charged crime. The prosecution offered two different theories, which we ultimately rejected. More importantly for our purposes here, we assessed the comparative evidentiary power of the prior act to prove that the defendant committed the charged crime with its evidentiary tendency to prove his bad character. *Id.* at 1319–20.

We reasoned that the prosecution's first theory had little probative value, that is, its admission would do little to prove that this defendant committed the charged murder. The prior gun incident did not demonstrate the ability of the defendant to use a "martial maneuver," as the prosecution argued. Rather, it established only that the defendant was capable of putting a gun to the head of an awakening person. In addition, there was no evidence that the murder involved a "martial maneuver." We noted that this prior incident did not suggest that the defendant draws a gun when he intends to use it because he pointed it and failed to pull the trigger. *Id.* at 1319.

Similarly, we reasoned that the prosecution's second theory did little to prove that the defendant killed the victim because the uncharged gun incident and the charged act were not sufficiently similar enough to infer that it was not an accident, as claimed by the defense. For the prosecution's theory to rebut the defendant's claim of accident, it would have needed evidence of uncharged crimes, i.e., that the defendant had killed several people by shooting them in the neck. Because the uncharged act constituted weak evidence of the crime charged, we concluded that the uncharged incident was not logically relevant independent of the forbidden character inference. *Id.* at 1319–20.

Thus, as we reasoned in *Spoto,* "independent of the intermediate inference" meant comparing the probative value of the inference to be made between the uncharged acts and the crimes charged to ensure that the

impermissible inference does not significantly outweigh the permissible or relevant non-character inference. We focused on the uncharged misconduct because its persuasive value to prove the charged crime was so weak that the jury would be unfairly swayed against the defendant by the fact that the defendant was the type of person—because of his prior use of a gun—to commit the crime charged.

To admit uncharged misconduct, a court must compare the strength of the non-character, relevant inference, that is, the evidentiary power that proof of the uncharged crime possesses to prove the charged crime, with the power of the impermissible inference, that is, the evidentiary power that the uncharged acts possess to unfairly influence the jury's truth-determination process. *See* Miguel A. Mendez & Edward J. Imwinkelried, *People v. Ewoldt: The California Supreme Court's About–Face on the Plan Theory for Admitting Evidence of an Accused's Uncharged Misconduct*, 28 Loy. L.A. L.Rev. 473, 502 (1995)(comparing the value of the evidence as proof of the proper inference to the value of the evidence as proof of an improper, or character inference). This weighing or comparison process is critical to the central purpose of C.R.E. 404(b), which is to admit relevant and probative evidence of guilt while excluding uncharged acts that are likely to create unfairness in the jury's assessment of the charged crime. When engaging in this process of comparing the relative evidentiary strength of the relevant non-character inference to the non-relevant character inference, under-inclusiveness can lead to the exclusion of material evidence proving guilt while over-inclusiveness can lead to a substantial risk of unfair prejudice:

> Under-inclusiveness leads to the exclusion of too much relevant evidence, making the truth-determination function of the trial more difficult to serve. Over-inclusiveness creates great danger of unfair prejudice, which can lead both to inaccurate truth-determination and fundamental unfairness.

Leonard, 34 Loy. L.A. L.Rev. at 441. Because of the obvious dangers of being either under-inclusive or over-inclusive, a trial court must analyze the value of the uncharged misconduct by carefully following *Spoto:* describing the uncharged misconduct evidence with specificity, identifying the forbidden character inference and the permissible, relevant, non-character inference and determining whether the permissible inference is truly independent of the impermissible inference.[4]

Turning to this case, we must ask: does the evidence of the defendant's fantasies provide a strong inference that this defendant committed this crime? Does it provide a powerful inference that the defendant is an evil person? And, what are the relative strengths of these two inferences—one permissible and the other not? What do a thousand pages of writings and drawings, depicting scenes of general violence, the majority of which have no semblance to the crime charged, more powerfully suggest, that the defendant killed this victim or, that the defendant is a person with violent and antisocial fantasies? The majority neither asks nor answers these questions.

From the beginning of this case until the verdict, the defendant's uncharged fantasies dominated. For example, in opening statement, the prosecutor told the jury: "This case is very different than most murder cases. It is not a case typically that you find of greed and anger and revenge. It is a case of an individual acting out a fantasy life."

The prosecutor ended his rebuttal closing argument by urging the jury to convict the defendant because his fantasies (the drawings and stories, which were physically placed in paper evidentiary bags) proved that he committed this crime:

> Please take the time to look at those drawings, read the narratives, study this evidence. The evidence is there. Sometimes it's hard to find. Sometimes you have to do a little thinking as to how the defendant could draw something like that unless he knew how it happened. Please look and read, study, dig into the paper bags. The evidence is there.

---

4. Although I focus on the third prong, other acts evidence must also satisfy the remaining relevancy prongs of the *Spoto* test to be admitted. *See Rath,* 44 P.3d at 1038.

In addition, throughout the prosecution's case, at least 90 slides of the defendant's drawings and writings were displayed to the jury.[5]

On review, the majority dismisses this evidence. In response to the prosecution's key motive theory of "sexual homicide," the majority concludes that although the uncharged misconduct evidence may appear unrelated to the crimes charged, it was really part of a common scheme, "hatched by a warped criminal mind." Majority op. at 998. For other purposes, the majority concludes that "the evidentiary hypotheses are independent of the prohibited propensity inference." Majority op. at 1000–1001 (reviewing the evidence to show plan, preparation, deliberation, intent and knowledge). In effect, the majority simply restates the "magic words" found in 404(b) without a specific analysis of the impact of this evidence.[6] *Spoto* and the foundations of 404(b) require more than a mere recitation that the evidence is independent of the non-relevant, forbidden character inference.

The uncharged acts here consist of over twenty notebooks and folders with over a thousand pages of drawings and writings by the defendant. From these pictures and stories, two disturbing patterns emerge.

First, contrary to the majority's assertion that there are only a "few drawings and writings that are nothing more than evidence of Defendant's violent nature," Majority op. at 1002, there are literally hundreds of images and narratives that depict gruesome violence against men, children and animals that have no relationship to the charges. Multiple scenes of violence are oftentimes on each page, with various methods and means

of killing and torturing victims, including shooting, hanging, drowning, and gassing. Narratives include stories that are often hundreds of pages long, single-spaced, describing death, despair and destruction.

A small sample of the drawings and writings, and what they depict, illustrates the nature of the uncharged misconduct admitted to prove that the defendant stabbed the victim in the back with a knife, dragged her into an open field, and cut her nipple and vagina:

> Babies or children dying horrible deaths: heads blown off; heated up in a microwave; thrown through a window; thrown into moving propellers; exploding; fed through a meat grinder; grenade exploding in the mouth; and shredding. Some of the parents of these children appear to be trying to save them, but to no avail;

> Various animals, usually cats and birds, drowned, put in microwaves, eaten alive, run over with lawnmowers, shot and fed through meat grinders;

> Multiple torture chambers showing people dying by suffocating, drowning, fires, being smashed and pulled apart;

> Over a hundred pages of narratives describing nuclear, chemical and biological warfare, including a focus on World War II Germany, radiation fallout and how the body dies in the event of such a war.

Second, in addition to these writings and drawings that illustrate methods and means of death that fail to demonstrate any semblance to the crime charged, the notebooks and folders illustrate a pattern of extreme racial and ethnic prejudice and hatred towards historically disadvantaged groups. There are numerous bigoted and racist drawings and narratives regarding the disabled,

---

5. The prosecutor's closing argument emphasized the overwhelming number of drawings and writings:

> These are excerpts of hundreds and hundreds of pages of narratives ... about brutal killings and death and dismemberment. [The defendant] was fantasizing about knives; 186 references in the materials to knives. He was fantasizing about death; 291 references. He was fantasizing about blitz attacks, surprise attacks from behind, mostly to strangers; 126 times. He was fantasizing about stabbing or slicing or disemboweling or eviscerating; 145 times.

> This is a kid who wrote hundreds and hundreds and hundreds of pages of gory, grizzly [sic] death scenes about torture, about killing.
>
> [The defendant] fantasized obsessively. I would submit to you he fantasized compulsively. He did it in class when he was supposed to be doing other things. Look at the numbers in this case of drawings and pages of narratives.

6. The majority states that "the prosecution appropriately limited *its* use *of the other acts* evidence." Majority op. at 998, n. 4. However, the record reveals that the prosecution emphasized the defendant's fantasies at every opportunity.

Jews, "Spics," "Fags," "Gooks" and "Niggers," that are contained throughout the exhibits, including:

In a homework assignment about gaining understanding about people who are "hard of hearing," the defendant writes: "Personally I don't care about the deaf. I don't know anyone who's deaf so I don't worry about it.";

Pushing multiple people in wheelchairs down cliffs;

A Nazi concentration camp showing people caught in barbed wire, being electrocuted and whipped by an SS officer, doctors pulling out intestines, and two signs saying "Welcome, Each and Every God-damn Jew" and "Kill the Jew";

Numerous missiles about to be launched with Jews and Mexicans, including children, chained to the side by their ankles;

"Mario the Mexican Monkey" sitting in a tree with a human face and a sombrero, about to be electrocuted, hanged, and hunted during "Monkey Open Season";

Texas Border patrol shooting Mexicans;

A person shooting a gun with the caption "The Cure for AIDS";

"Gay fags" being shot by Rambo at close range;

"I nailed the Gook first, filling him with 5 holes. 'Ooooh,' one of the Reds moaned, the Gook. 'Oh man,' I said with an evil grin. 'Of all the fuckers to still be alive it had to be you.'"

"Pete and his self were the only two white people in the Club the rest were Chicano or Oriental. He chuckled as he decided that was why everyone was ignoring him." He later kills all the Chinese club owners and jokes how he might go into the Chinese restaurant business.

"Im not prejudice, I hate all them black fuckin Nigers the same";

KKK shooting a large automatic gun, thinking "NIGER"

In my view the fantasy evidence strongly and overwhelmingly provided powerful sug-gestions of the impermissible, non-relevant inference—that the defendant was a person with an evil and bad character.

Having concluded that the impermissible purpose of this evidence was powerful, I turn to evaluate the strength of the relevant, non-character inference that links the defendant to this murder. I conclude that it constitutes very weak probative evidence linking him to the crime. This is so even though some of the defendant's fantasies, particularly those reflecting the hatred of women,[7] blitz attacks and piquerism, are arguably admissible.

First, the writings and drawings are not even "acts," but merely reflect, for the most part, a 15 year-old's fantasies.

Second, not one of these 1000 drawings and narratives concerns this victim personally. None of these drawings or narratives reflects the manner in which the victim was killed. For example, there is no picture of, or a story about, a woman being stabbed in the back or having her nipple excised. Clearly, any uncharged conduct on the defendant's part connecting him to this victim or the way she was killed would be highly relevant to prove motive or plan and would be admissible to prove guilt. For example, in *People v. Snyder*, 874 P.2d 1076, 1080 (Colo. 1994), we found that the defendant's prior sexual misconduct with the victim was admissible to prove he committed the charged sexual assaults because it was the same victim and the circumstances of the prior sexual misconduct and the charged assaults were similar. And in *People v. Janes*, 942 P.2d 1331, 1336 (Colo.App.1997), the court of appeals found that the circumstances involving prior uncharged sexual conduct with a different victim were so similar to the circumstances of the charged assaults to be admissible. In the *Janes* case, the victims were all male and the same age, both assaults occurred in the defendant's house with his wife and others present, the defendant engaged in the same sexual behavior including giving the victims hickeys, and the defendant offered

---

7. As a member of the hated group, the female victim was a specific target. *See* Leonard, 34 Loy. L.A. L.Rev. at 453 ("Hatred ... can be directed toward a single individual or toward a group of people sharing some common characteristic. Even this type of generalized motive is not the same as character.").

the victims money but gave the same warnings. *Id.*

Third, aside from the "hatred of women" motive, there is no articulated motive that the defendant's fantasies of violence against men, children and animals tend to prove why this defendant would have killed this particular victim. The drawings and writings do not provide "the moving force" which would impel this defendant to a "definite result," i.e., the defendant targeted this victim to kill. *See* Imwinkelried, *Uncharged Misconduct Evidence* § 3:15, at 78.

Fourth, the majority relies upon the prosecution's expert to link the defendant's fantasies to this crime, in spite of the failure of the fantasies to show a link to this specific victim and this specific crime. As the majority correctly notes, the trial court premised the admissibility of the narratives and drawings on the expert's testimony to prove the stated exceptions to C.R.E. 404(b). *See* Majority op. at 985–988.

When the expert's analysis is generally accepted by the relevant scientific community, courts should find that the evidence is relevant for its non-character or motive purpose. Any analysis regarding whether a homicide is a "sexual homicide" is generally accepted by the scientific community and thus would be relevant for non-character purposes. On the other hand, where there is genuine scientific debate over the validity of the expert's propositions, the non-character purpose of the uncharged acts is much weaker and the danger of use by the forbidden character inference much greater. *See* Leonard, 34 Loy. L.A. L.Rev. at 531 (the existence of a "genuine debate in the scientific community about the validity of the syndrome or condition supposedly represented by the relevant behavior or state of mind" weighs against the probative value of expert testimony regarding the relevant behavior or state of mind).[8]

Here, the prosecution expert's analysis purported to find that the fantasies of admitted sexual perpetrators were similar to those of the defendant, but that analysis has not yet been accepted by the relevant scientific community because it has not been validated. The defense's expert, who has testified on behalf of the prosecution in eighty percent of his cases, stated that the link between deviant sexual fantasies and sexual homicide does not enjoy acceptance because the few studies that have been done all involve convicted offenders who talked about their past fantasies and past acts, the research is new, sample sizes are small, and the studies fail to use control groups. The lack of control groups is particularly telling because the scientific community does not know the percentage of those in the general population who engage in violent and sexual fantasies but who do not commit sexual offenses. In addition, the defense expert testified that current scientific journals have reported that the relationship between sexual fantasies and sexual homicides is tentative and opined that no conclusions can be drawn linking fantasies to conduct. Indeed, the inconclusive nature of this research is apparent when one of the two studies relied upon by the prosecution's expert is also relied upon for the proposition that "normal people," that is, persons who do not commit criminal behavior, also engage in deviant sexual fantasies. Thus, while the testimony of the prosecution's expert was admissible under C.R.E. 702, as explained by the majority, his theory of how the defendant's fantasies tied this defendant to this crime constitute, at best, minimal evidence of such a crime.

Taken as a whole, the defendant's writings and drawings establish a minimal evidentiary inference connecting him to the death of Peggy Hettrick. Although some of the drawings and writings depict hatred against women and are admissible, there is nothing written or drawn about her personally, about the specific means of her death, or about the motive explaining why she was chosen. The mere fact that an expert was permitted to theorize about the defendant's fantasies does not strengthen this weak evidentiary link.

---

8. For example, many courts are divided with respect to the admissibility of evidence of battered child syndrome, partly because of uncertainty about the scientific basis for its existence.

*See* Annotation, *Admissibility of Evidence of Battered Child Syndrome on Issue of Self-Defense,* 22 A.L.R.5th 787, 793–94 (2000).

The logical relevance of the defendant's uncharged fantasies is minimal when compared to the overwhelming power of these fantasies to depict the defendant as an evil and bad person.

The majority overlooks the grave danger of unfair prejudice that occurred here—that this case was tried and the prosecution's theory relied extensively upon the defendant's bad character. A jury might reasonably infer, from over a thousand pages of these types of drawings and writings—contained in over twenty notebooks and emphasized repeatedly by the prosecution—that the defendant was a repulsive and violent boy with grisly fantasies, who should be punished just because of these fantasies. Even assuming that some of the drawings and writings would be admissible, there are hundreds and hundreds of pages that have nothing to do with this case.

The admission of these hundreds and hundreds of pages, was not, as the majority asserts, harmless error. The inquiry for harmless error is whether the error "substantially influenced the verdict or affected the fairness of the trial proceedings." *People v. Gaffney*, 769 P.2d 1081, 1088 (Colo. 1989).

The majority primarily relies on the *Gaffney* case to support its conclusion that while there are a "few drawings and writings that [were] nothing more than evidence of [the defendant's] violent nature" and that while the defendant's prejudices were exhibited by the "sporadic use of ethnic slurs," this inadmissible evidence did not substantially influence the verdict or impair the fairness of the trial. Majority op. at 1002, 1003–1004. To reach its conclusion, the majority reasons that the jury, having already been exposed to admissible, violent evidence in a first degree murder case, would not be substantially influenced by "similar images of violence" and even if some of the violent and racist writings and drawings were admitted, the "improperly admitted pages were not emphasized or relied on by the prosecution in presenting its case." *Id.* at 1003. I disagree.

The overwhelming volume of inadmissible and prejudicial evidence in this case, portraying the defendant as an extremely violent and hate-filled racist, distinguishes this case from *Gaffney*. In *Gaffney*, this court found that a pediatrician's testimony concerning the character of a child-victim was inadmissible but held that it was harmless error in light of the entire record. *Gaffney*, 769 P.2d at 1082. *Gaffney*, however, involved one inadmissible statement of one witness: "This history is very believable." *Id.* at 1083. This case is factually distinct from *Gaffney*: there are hundreds of pages of inadmissible writings and drawings and numerous examples of highly inflammatory and prejudicial material that were spread throughout trial testimony and exhibits.

Because the jury had already been exposed to violent evidence in a first degree murder case, the majority reasons that the jury could not be substantially influenced by evidence of similar,[9] inadmissible violence. As a general proposition, I believe this statement cannot stand. The prejudicial impact of images showing babies blown up in microwaves or put through meat grinders paints a picture for the jury that not only is the defendant violent but also that he is despicable, hate-filled and sadistic, comparable to only a few of histories worst pariahs. The notion that juries can be conditioned to violent, inadmissible, prejudicial evidence in cases where violence is admissible must and should be rejected. It means that in such cases, a rational jury will never be substantially influenced by irrelevant, inadmissible and prejudicial violent acts of the defendant despite the negative impact and the powerful prejudice engendered by these acts. Thus, an appellate court in such cases would never be in a position to find reversible error to rectify an unfair criminal trial.

The majority's assurance that the prosecution did not emphasize or rely on the inadmissible evidence, described, in part, as the "sporadic use of ethnic slurs," mischaracter-

9. Parenthetically, I note that that the inadmissible evidence was not "similar" to the charged crime.

izes the nature of the inadmissible evidence and the trial proceedings.[10]

The prosecution showed the jury numerous images drafted by the defendant that glorified the Ku Klux Klan, the Nazi party and killing and tortures of people based on their racial, ethnic and religious backgrounds, sexual orientation and physical limitations. Overwhelming images and narratives that advocate mutilating and maiming people based solely on their ethnicity, sexual orientation, or disability should not be overlooked and approved as "sporadic ethnic slurs."

Not only are these violent and hate-filled examples spread throughout the writings and drawings, the prosecution made no effort to guard against their prejudicial impact and, in fact, emphasized some of them to the jury. As noted earlier, the prosecutor in opening and closing remarks stressed the significance of the defendant's fantasies, some of which contained blatantly inadmissible examples of the defendant's racist and bigoted attitudes, as well as inadmissible violent, uncharged acts. The prosecution highlighted many of these inadmissible, inflammatory examples through the testimony of Lieutenant Broderick because they were next to a drawing, or part of a narrative, that the prosecution argued as being proof that the defendant committed this murder.

Lieutenant Broderick testified about Exhibit 97(16), shown as a slide, and blown-up for the benefit of the jury, because it depicted a "surgeon performing surgery .... with a large survival knife" on a patient whose "legs and arms are restrained." That drawing, however, marked with a color tab by the prosecution, depicts the Nazi death camp welcoming "Each and Every God-damn Jew" and the caption "Kill the Jew." Lieutenant Broderick also testified about another slide, blown-up for the benefit of the jury, depicting Exhibit 97(23). While Exhibit 97(23) shows doctors using saws, machetes and knives on people, it also shows a doctor firing a gun with the caption "I've found the cure for AIDS." Lieutenant Broderick also testified about Exhibit 92, which contains a narrative with tabbed pages with multiple references to "spics" and "the niger" who says "dis way."

As a result, unlike the majority, I cannot say with fair assurance that these racist and bigoted depictions, when considered in addition to the defendant's writings and drawings of gruesome and loathsome violence unrelated to the charged crime, did not substantially influence the verdict or impair the fairness of the proceedings. The explicit admission of these heinous images and descriptions, highlighted by the prosecution, "cast an irreparable cloud of condemnation over the defendant" and assured the unfairness of these proceedings. *See Callis v. People*, 692 P.2d 1045, 1053 (Colo.1984).

## Conclusion

By failing to engage in a specific *Spoto* weighing analysis, the majority approves an "over-inclusive" approach to C.R.E. 404(b) which encourages the indiscriminate admission of an accused's uncharged misdeeds. I fear the weakening of the Rule's purpose, which is to assure that our criminal system punishes someone for his acts and not for the kind of person he is. As the record reveals, the wholesale admission of all of the defendant's fantasies prove too great a danger of

---

10. The majority contends that the trial court would likely have required the prosecution to redact the inflammatory material had the defendant only requested the court to do so. Majority op. at 1003. Under a plain error analysis, the admission of numerous inflammatory narratives and drawings, emphasized by trial exhibits and the testimony of Lieutenant Broderick, undermined the fundamental fairness of this trial and cast serious doubt on the reliability of the conviction. *Wilson v. People*, 743 P.2d 415, 420 (Colo. 1987). Even so, the majority fails to acknowledge that the defendant repeatedly objected to the admission of the writings and drawings under C.R.E. 403 before and during the trial. The

failure of the defense to request the redaction, however, does not relieve the trial court from its independent obligation to ensure a fair trial by preventing the admission of such inflammatory, irrelevant and grossly prejudicial evidence in the first place. *Harris v. People*, 888 P.2d 259, 264 (Colo.1995)(finding that a court must ensure the defendant's right to a "fair verdict, free from the influence or poison of evidence which should never have been admitted, and the admission of which arouses passions and prejudices which tend to destroy the fairness and impartiality of the jury.")(citing *Oaks v. People*, 150 Colo. 64, 68, 371 P.2d 443, 447 (1962)).

unfair prejudice to permit this conviction to stand. Hence, I would reverse it.

I am authorized to say that Chief Justice MULLARKEY and Justice MARTINEZ join in this dissent.

